## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jun 15 2016, 9:11 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Mark Small
Marion County Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General

Jodi Kathryn Stein
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Actora Bankhead,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

June 15, 2016

Court of Appeals Case No.
49A05-1503-CR-107

Appeal from the Marion Superior Court

The Honorable Mark Stoner, Judge

Trial Court Cause No.
49G06-1306-MR-39314

**Vaidik, Chief Judge.**

# Case Summary

[1] Actora Bankhead was charged with two counts of murder for breaking the necks of two people after a group-sex session went awry. Bankhead and his wife then wrapped the bodies in plastic, disposed of the bodies at a vacant lot in Indianapolis, and set them on fire. The bodies were undiscovered for a week, until Bankhead's wife told the police. Bankhead was convicted of the two murders and sentenced to 125 years.

[2] Although Bankhead contends that the trial court abused its discretion in admitting into evidence photographs of the victims' dead bodies covered with maggots, the record reveals that these photographs were never admitted into evidence. Also, we find that the trial court reasonably limited Bankhead's cross-examination of a prosecution witness for bias based on that witness's testimony in another high-profile murder case. Last, because there were multiple testifying witnesses, Bankhead's sufficiency challenge based on the incredible-dubiosity rule fails.

# Facts and Procedural History

[3] The facts most favorable to the verdicts show that Bankhead and his wife Diane were living in Diane's house on Dr. Martin Luther King Jr. Street in Indianapolis in June 2013. Bankhead, who was released from the Indiana Department of Correction to parole in March 2013, had met Diane while he

was in the DOC. After dating for about a week, Bankhead and Diane got married in April 2013.

[4] Around 1:00 a.m. on Friday, June 7, 2013, Diane returned home from work. She and Bankhead were in bed upstairs when Bankhead got a phone call from Michael Hite; Bankhead went downstairs to talk to Michael on the phone. A short time later, Michael came over. Michael parked his car on Indianapolis Avenue, near Diane's house. Bankhead and Michael talked and drank downstairs while Diane stayed upstairs. At some point, Diane heard the addition of a woman's voice; the woman was Crystal Lucas. Diane overheard Michael say that he had just met Crystal at the liquor store.

[5] Diane had just fallen asleep when Bankhead came to the bedroom and asked her to drive him, Michael, and Crystal to get some crack cocaine. Although Diane initially said no, she eventually relented and drove them in her van to an apartment at 38th Street and Boulevard Place; Michael went inside and came back out about ten minutes later. Diane then drove the trio back to her house and went to bed.

[6] Diane again had just fallen asleep when Bankhead came to the bedroom and told her that he was "high" and wanted the four of them to have sex. Tr. p. 45. Diane told Bankhead that she "d[idn't] roll like that." *Id.* But when Bankhead kept pressing the issue, Diane relented. So Michael and Crystal joined Bankhead and Diane in the bedroom. At some point, Crystal realized that Michael had ejaculated inside Diane. Crystal was upset because she knew that

Michael was HIV positive. Crystal then told Diane that Michael was HIV positive. Diane was "pissed." *Id.* at 405. Bankhead was angry too, because it "was like a death sentence for" his wife. *Id.* So Bankhead decided to kill Michael. *Id.*

[7] To carry out his plan, Bankhead lured Michael into the basement, stunned him with a stun gun, hog tied him, and then "popped his neck," killing him. *Id.* at 406. Concerned that Crystal would call the police and because Diane was jealous of Crystal (based on the earlier sexual episode), Bankhead killed Crystal in the same manner as Michael: he hog tied her and "popped" her neck. *Id.* at 408. According to the forensic pathologist, Crystal's hyoid bone was fractured and Michael had a fracture to his thyroid cartilage.

[8] Diane went to work as usual on Friday afternoon and returned home early Saturday morning. But when Diane started to get ready for work Saturday afternoon, Bankhead told her that Michael and Crystal were "gone." *Id.* at 56. Diane asked Bankhead what he meant, and Bankhead gestured by swiping his hand across his neck. He then told Diane that he had killed them. Bankhead took Diane to the basement, where she saw Michael's and Crystal's naked and hog-tied bodies lying on top of each other. Bankhead told Diane that she had to help him dispose of the bodies or else she would end up like them.

[9] After Diane got off work early Sunday morning, Bankhead and Diane wrapped Michael's and Crystal's bodies in plastic and then wrapped duct tape around the plastic. Bankhead and Diane carried the bodies upstairs and loaded them

into Diane's van. Bankhead then directed Diane to a vacant lot on Miley Avenue in the Haughville neighborhood of Indianapolis. Bankhead and Diane put the bodies in a tree-lined area on the vacant lot. Diane returned to the van while Bankhead removed the plastic from Michael's and Crystal's bodies and put the plastic in some trash bags. Bankhead then poured gasoline on the bodies and set them on fire.

[10] When Bankhead returned to the van, he directed Diane to an apartment building on Pennsylvania Street, where he disposed of the trash bags in a dumpster. Bankhead and Diane went home, where they removed valuables, including a stereo, from Michael's car, which was still parked on Indianapolis Avenue. Diane then drove Michael's car to an apartment complex on Guion Road and left it there. Bankhead followed Diane and picked her up.

[11] For the next week, Bankhead kept a close watch on Diane. During that time, Michael's friend, whom Michael had called during the early morning hours of Friday to say that he was at Diane's house with Bankhead and who had last seen Michael's car parked on Indianapolis Avenue on Saturday, began passing out missing-person flyers in Diane's neighborhood. Meanwhile, the murders were "eating [Diane] up inside." *Id.* at 65. So on Friday, June 14—exactly one week after the murders—Diane called the Indianapolis Metropolitan Police Department's homicide department and spoke to Detective Harry Dunn. *Id.* She told Detective Dunn about the murders and where the bodies could be found. Detective Dunn sent an officer to the vacant lot on Miley Avenue, where the officer found Michael's and Crystal's bodies. The bodies were in a

severe state of decomposition and infested with maggots. Although the dumpster at the apartment complex on Pennsylvania Street had already been emptied, Detective Dunn found Michael's car at the apartment complex on Guion Road. The stereo was missing from Michael's car.

[12] The State charged Bankhead with the murders of Michael and Crystal and with intimidating Diane. While Bankhead was in jail awaiting trial, his cell was near Jeremy Bullock's cell. Bullock was in jail awaiting trial in two burglary cases—one case involving Class C felony burglary and the other case involving Class B felony burglary and four other felonies. Bullock had previously served eighteen years in prison for a murder conviction in Johnson County. Bullock's murder sentence had been forty years, but in 2009 the Johnson County prosecutor agreed to modify his sentence. According to Bullock, Bankhead first approached him in jail for legal advice; however, Bankhead ended up telling Bullock about the double murders. Bullock thought that the story was "disturbing" and sent his mother a letter about it. *Id.* at 399. Bullock's mother then contacted the police, and eventually Detective Dunn interviewed Bullock.

[13] At the jury trial, Bullock testified in great detail about his knowledge of the double murders. According to Bullock, he received no benefit in exchange for his testimony. *Id.* at 399, 456. Specifically, Bullock testified that after Bankhead, Michael, and Crystal smoked crack cocaine, the three of them plus Diane had a "sex party" at Diane's house; Crystal told Diane that Michael, who was HIV positive, had ejaculated inside her; Bankhead and Diane were angry, so Bankhead decided to kill Michael; Bankhead hog tied and "popped"

the necks of Michael and Crystal in Diane's basement, killing them both; Bankhead and Diane wrapped the bodies in plastic and then dumped the bodies at a vacant lot in Haughville; Bankhead poured gasoline on the bodies and set them on fire; and Bankhead and Diane then removed the valuables from Michael's car and drove it to an apartment complex. *Id.* at 403, 406, 412.

[14] During direct examination, the State asked Bullock about a photograph of a body that Bankhead had shown him. But before Bullock could describe the photograph, defense counsel objected, on prejudice grounds, to any testimony concerning the burned and maggot-covered condition of the bodies. *Id.* at 412. The trial court overruled defense counsel's objection. The prosecutor resumed questioning Bullock, but the photograph was neither mentioned again nor admitted into evidence. *Id.* at 414.

[15] During cross-examination, defense counsel sought to introduce evidence that the Johnson County prosecutor agreed to modify Bullock's murder sentence in 2009 as a result of Bullock's testimony in David Camm's second murder trial in 2006.[1] The State objected because there was no evidence linking Bullock's testimony in the second Camm trial to the modification of his murder sentence. The trial court ruled that defense counsel could not mention the name "Camm" because the name was unduly prejudicial: "[L]et me be really clear. The name

[1] Camm was charged with the murders of his wife and two children; he was tried three times before being acquitted in 2013. This story garnered significant national attention. Bullock testified in the second and third trials.

*Camm* is never going to get in front of this jury. . . . I think that is way too well known in terms of the information." *Id.* at 426, 432-33. The court said, however, that defense counsel could question Bullock about testifying on behalf of the State in another murder trial because "[Bullock's] motive in terms of trying to gain a better bargain for himself is relevant." *Id.* at 432. Defense counsel then extensively cross-examined Bullock on the following topics: (1) Bullock's testimony in a 2006 murder trial (Camm), after which he received a modification of his murder sentence; (2) Bullock was currently facing trial for six felonies, with a sentencing exposure of seventy-seven years; (3) in October 2014, Bullock wrote a letter to a judge in Johnson County asking for leniency in his probation-revocation case because he was cooperating with some murder cases in Marion County; and (4) while he had been in jail for the past nine months awaiting trial, Bullock sent the Marion County prosecutor eight letters about eight other defendants, most of whom were facing murder charges.

[16] The jury found Bankhead guilty of Michael's and Crystal's murders but not guilty of intimidating Diane. The trial court sentenced Bankhead to an aggregate term of 125 years.

[17] Bankhead now appeals.

# Discussion and Decision

[18] Bankhead raises three issues on appeal. First, he contends that the trial court abused its discretion in admitting into evidence photographs of Michael's and

Crystal's dead bodies covered with maggots. Second, Bankhead contends that the trial court improperly restricted his right to cross-examine Bullock about his bias. Last, he contends that Diane's testimony was incredibly dubious and therefore the evidence is insufficient to support his murder convictions.

# I. Photographs of Victims' Dead Bodies

[19] Bankhead first contends that the trial court abused its discretion in admitting into evidence photographs of Michael's and Crystal's dead bodies covered with maggots because they were unduly prejudicial. But as the State explains in its brief, no photographs of Michael's and Crystal's dead bodies were admitted into evidence. The record shows that during Bullock's direct examination, the State asked him about a photograph that Bankhead had shown him of a body. But before Bullock could describe the photograph, defense counsel objected to any testimony concerning the burned and maggot-covered condition of the bodies. Tr. p. 412. The trial court overruled defense counsel's objection. The prosecutor resumed questioning Bullock, but the photograph was neither mentioned again nor admitted into evidence. *Id.* at 414. Indeed, Bankhead does not cite any exhibit numbers, and our review of the exhibits confirms that no photographs of Michael's and Crystal's dead bodies were admitted into evidence. And notably, Bankhead did not file a reply brief in order to respond to the State's claim that no such photographs were admitted into evidence. There is no error on this issue.

# II. Reference to David Camm Trial

[20] Bankhead next contends that the trial court improperly restricted his right to cross-examine Bullock about his bias when it ruled that "Bankhead's counsel could not mention the name 'Camm' in front of the jury." Appellant's Br. p. 13. While the right to cross-examine witnesses is guaranteed by the Sixth Amendment to the United States Constitution and Article 1, Section 13 of the Indiana Constitution, trial judges retain wide latitude to impose reasonable limits on defense counsel's inquiry into the potential bias of a prosecution witness based on concerns of, among other things, prejudice. *Wilson v. State*, 39 N.E.3d 705, 712 (Ind. Ct. App. 2015), *trans. denied*; *Collins v. State*, 835 N.E.2d 1010, 1015 (Ind. Ct. App. 2005), *trans. denied*. Only a clear abuse of discretion warrants reversal. *Collins*, 835 N.E.2d at 1015.

[21] Here, defense counsel wanted to question Bullock about his testimony in Camm's second trial, but the trial court ruled that defense counsel could not mention the name "Camm" because it was unduly prejudicial. Nevertheless, the court ruled that defense counsel could question Bullock about testifying on behalf of the State in another murder trial. And defense counsel did just that:

> Q. . . . You testified previously on a murder case, did you not?
>
> A. Yes, sir.
>
> Q. That was back in 2006?
>
> A. I believe so.

Q. And then after that testimony in 2006, you actually received a modification of your forty year Department of Correction sentence, right?

A. I did.

Q. On your murder case?

A. Yes.

Q. And as a result of that modification you are now on probation for that case?

A. Yes.

Tr. p. 440-41. Based on this exchange, defense counsel was sufficiently permitted to attack Bullock's credibility based on his testimony in another murder case even though the name of that trial was not mentioned. This was a reasonable limit on defense counsel's cross-examination of Bullock given the fact that Camm's prosecution was so widely publicized. The trial court did not abuse its discretion.

## III. Incredible-Dubiosity Rule

Finally, Bankhead contends that Diane's testimony was incredibly dubious and therefore the evidence is insufficient to support his murder convictions. The premise of Bankhead's argument is that although Diane testified extensively at trial about how Bankhead forced her to participate in disposing of Michael's

and Crystal's bodies, the jury acquitted Bankhead of intimidation and the trial court commented at sentencing that it believed Diane should have been charged with Michael's and Crystal's murders under an accomplice-liability theory. *See id.* at 542, 544.

[23] In making this argument, Bankhead claims that the incredible-dubiosity rule "is not necessarily rendered inapplicable merely because more than one witness testifies for the State." *See* Appellant's Br. p. 15 (citing *West v. State*, 907 N.E.2d 176 (Ind. Ct. App. 2009)). To the contrary, our Supreme Court recently re-examined the scope of the incredible-dubiosity rule, clarifying that application of the rule is indeed restricted to cases where there is a single testifying witness. *Moore v. State*, 27 N.E.3d 749, 757 (Ind. 2015). Specifically, our Supreme Court clarified that this rule requires that the following three conditions be satisfied: (1) a sole testifying witness; (2) testimony that is inherently contradictory, equivocal, or the result of coercion; and (3) a complete absence of circumstantial evidence. *Id.* at 756.

[24] But here, Diane was not the sole testifying witness. Bullock testified in great detail about Bankhead's confession to the double murders. Corroborating witnesses testified too, including Detective Dunn, who testified about Diane calling him at the homicide department and him finding Michael's car at an apartment complex, as well as Bankhead's friend, who testified that Michael had called him during the early morning hours of Friday to say that he was at Diane's house with Bankhead and who had last seen Michael's car parked on Indianapolis Avenue on Saturday. *See id.* at 757 (in concluding that the

incredible-dubiosity rule did not apply because there were multiple witnesses, the Supreme Court noted that although there was only one eyewitness to the murders, another witness placed the defendant at the scene, and there were corroborating witnesses as well). Because "the testimony of multiple witnesses alone precludes the application of the incredible[-]dubiosity rule," *id.* at 758, Bankhead's sufficiency challenge on this basis fails.

[25] Affirmed.

Barnes, J., and Mathias, J., concur.