ATTORNEY FOR APPELLANT
Philip R. Skodinski
South Bend, Indiana

ATTORNEYS FOR APPELLEE
Gregory F. Zoeller
Attorney General of Indiana

Brian L. Reitz
Deputy Attorney General
Indianapolis, Indiana

# In the
# Indiana Supreme Court



FILED
Mar 24 2015, 10:01 am
CLERK
of the supreme court,
court of appeals and
tax court

No. 71S00-1405-LW-361

CHARLES MOORE,

*Appellant (Defendant below),*

v.

STATE OF INDIANA,

*Appellee (Plaintiff below).*

Appeal from the St. Joseph Superior Court, No. 71D02-1201-MR-000002
The Honorable John M. Marnocha, Judge

On Direct Appeal from a Sentence of Life Imprisonment Without Parole

**March 24, 2015**

**David, Justice.**

Charles Moore was charged with the murders of Alejandro Tinoco and Jazmin Conlee. After Moore was found guilty of both murders, the jury recommended a sentence of life without the possibility of parole for the murder of Conlee. Moore was ultimately sentenced to sixty-five years for the felony murder of Tinoco and life without parole for the murder of Conlee. Moore appealed solely on the basis that there was insufficient evidence for his convictions. Specifically,

Moore asserts that the incredible dubiosity rule should be applied. The incredible dubiosity rule allows the court to impinge upon the jury's assessment of witness credibility when the testimony at trial is so contradictory that the verdict reached would be inherently improbable. For the incredible dubiosity rule to apply, the evidence presented must be so unbelievable, incredible, or improbable that no reasonable person could ever reach a guilty verdict based upon that evidence alone. Moore argues the application of this rule is warranted because no reasonable jury could have found him guilty beyond a reasonable doubt given the inconsistent testimony among three of the State's primary witnesses. We disagree. Here, direct and circumstantial evidence was presented through the testimony of multiple witnesses and the presentation of physical evidence. This evidence was sufficient for a reasonable jury to find Moore guilty beyond a reasonable doubt for both murders. Under the facts of this case, the incredible dubiosity rule is inapplicable, and the jury's verdict must stand. Moore's convictions and sentence are affirmed.

### Facts and Procedural History

On January 25, 2012, South Bend Police Officer Joshua Morgan was dispatched to 1101 North Adams Street, where a reported shooting had occurred. Officer Morgan arrived at the scene at approximately 8:50 p.m., and other patrol officers had already arrived at the scene. Officer Morgan had to carefully open the front door when entering the house because one of the victims was lying just inside. The young man, later identified as Alejandro Tinoco, had been shot in the head. Although he was breathing, he was in critical condition. Upon entering the house, Officer Morgan also observed a female victim, later identified as Jazmin Conlee, who had also been shot and was sitting up against the wall behind a couch. Conlee was breathing but in critical condition as well. Both victims were taken to the hospital, where Tinoco was soon pronounced dead, and Conlee immediately underwent surgery. Although Conlee underwent multiple surgeries, it was determined that she would not recover from her wounds, and she was pronounced dead on February 8, 2012. Both Tinoco and Conlee died as a result of gunshot wounds.

The police were able to discover the identity of four individuals who were suspected of being involved in these shootings. Those individuals were Jermon Gavin, Joseph Buti, Rakeem

White, and Charles Moore. Gavin knew each of these men, but the others were not familiar with one another. Gavin was also a friend of Tinoco's. The events leading up to the shooting transpired with Gavin, Buti, and White meeting up to smoke marijuana. Gavin first picked up White, and after that picked up Buti. After smoking marijuana, the three went to pick up Moore. The four men discussed going to get more marijuana. Gavin knew that Tinoco sold marijuana and had purchased marijuana from him on prior occasions. Gavin drove the vehicle to Adams Street, where Tinoco lived.[1] At some point during the drive, either Gavin or White passed something wrapped in a white cloth back to Moore.

After arriving at Tinoco's house, Buti walked onto the front porch and knocked on the door. Tinoco had a camera on the porch that displayed on a television inside who was at the front door. The camera only provided a live feed and did not record. When Buti arrived at the door and said his name, he was instructed to look at the camera. Tinoco then opened the door and started talking to Buti. Peter Kagimbi and Jazmin Conlee also lived at the residence and were inside when Buti arrived. Kagimbi was standing in the main room by the dining room table but saw Buti on the television screen. Tinoco asked Buti who he was and why he was there, and Buti explained that he was there to buy marijuana. When Tinoco refused to sell him marijuana, Buti started to leave. In the meantime, Moore had gotten out of the vehicle and approached the house. When Buti stepped outside onto the porch, he saw Moore rise up from behind the porch with a mask on and a gun. Buti kept walking away from the house, and when he turned around to see what was going on he saw Moore trying to force the door of the house open, while Tinoco was trying to close it. Kagimbi heard the struggle at the door, then heard a gunshot, and he immediately ran out of the back door of the house. Buti continued to watch from the sidewalk, and he saw Moore shoot

---

[1] Gavin testified that Buti had wanted to rob Tinoco because Tinoco owed him money, while Buti said it was Gavin who was angry with Tinoco over what he was being charged for marijuana. It is unclear the real reason the group initially went to Tinoco's house, but it is not disputed that the motive involved marijuana and/or money.

Tinoco in the head. Moore pushed Tinoco inside the house, entered, and closed the door behind him.

Buti saw Kagimbi running out through the back and followed him. Kagimbi confirmed that when he ran out the back, he recalled seeing the same young man who he had seen on the television monitor at the front door. Kagimbi only later realized that the person on the television monitor could not have been the person who shot Tinoco and Conlee because the person he had seen at the door would not have been able to shoot both victims and already be outside following him in such a short amount of time.

Dimitri Johnson, a friend of Kagimbi's, also confirmed seeing two different individuals around Tinoco's house that night. Johnson was at the house because he had plans to meet up with Kagimbi. Johnson remembered seeing a light-skinned man near the house in a red or white jacket, and not long after he saw another man in dark clothing walk around his vehicle and onto Tinoco's porch. Johnson then heard two gunshots and saw Kagimbi run out of the house. Johnson then saw the man in the dark clothes get into a gray or silver car that was parked near the house. That night, Gavin was driving his girlfriend's silver Pontiac Grand Prix.

Shortly after shots were fired, Gavin confirmed that Moore ran back to the car. Once in the car, Gavin saw Moore pass a gun to White. Gavin noticed that Moore was very sweaty, nervous, and out of breath when he returned. Gavin then received a phone call from Buti to come pick him up. When they arrived where Buti had run to, Buti said, "Man, he just ran in there and got to shooting people." (Tr. at 546.) Buti was seemingly talking about Moore. Buti got in the car and saw Moore with a large bag of marijuana. Buti recalled Moore rocking back and forth and saying, "I shot them, I killed everyone." (Tr. at 466.) At some point after, each of the four men went their separate ways. Gavin recalled that soon after he departed from Moore's company, Moore called him and threatened that the same thing that happened to Tinoco and Conlee could happen to them.

Meanwhile, Kagimbi had run to Tinoco's parents' house, told them what had happened, and Kagimbi called 9-1-1. Later that evening, Buti also called the police and told them he was a witness to the shooting. The police investigation ensued. Bloody shoe prints at the scene of the crime, DNA evidence on the floor mat of the vehicle Gavin was driving the night of the shooting, and a do-rag left at the scene all connected Moore to the shootings.

On January 30, 2012, Moore was charged with Count I, Class B felony robbery;[2] Count II, felony murder of Alejandro Tinoco;[3] Count III, murder of Alejandro Tinoco;[4] and Count IV, attempted murder of Jazmin Conlee.[5] The trial court later granted the State's motion to vacate Count IV and add Counts for the murder and felony murder of Jazmin Conlee.[6] On August 22, 2012, the trial court granted the State's motion to add the sentencing enhancement of life without parole for the murder of Conlee.[7] Moore's jury trial commenced on August 19, 2013. At trial, Buti, Gavin, and a jail mate of Moore's, Steven Martin, all testified against Moore and implicated him as the shooter of both victims.

The jury returned guilty verdicts on all five counts as charged. On August 26, 2013, the sentencing phase of the trial began. The jury recommended a sentence of life without parole for the murder of Conlee. The trial court only entered convictions for Count II, felony murder of Tinoco, and Count IV, intentional murder of Conlee, to avoid double jeopardy concerns. Moore

---

[2] Ind. Code § 35-42-5-1 (2008).
[3] Ind. Code § 35-42-1-1(2) (2008).
[4] Ind. Code § 35-42-1-1(1) (2008).
[5] Ind. Code §§ 35-42-1-1; 35-41-5-1 (2008). Jazmin Conlee was still alive at the time this charge was filed, and was not pronounced dead until February 8, 2012.
[6] These Counts were ultimately renumbered as Count IV, murder of Jazmin Conlee, and Count V, felony murder of Jazmin Conlee.
[7] "The state may seek . . . a sentence of life imprisonment without parole for murder by alleging, on a page separate from the rest of the charging instrument, the existence of at least one (1) of the aggravating circumstances listed in subsection (b)." Ind. Code § 35-50-2-9 (2008).

ultimately received a sixty-five-year sentence for Count II, felony murder of Tinoco, and a sentence of life without parole for Count IV, murder of Conlee.

Moore appealed, asserting that there was insufficient evidence to support his convictions, and that the testimony of the prosecution's three primary witnesses was so contradictory as to be unbelievable. Moore's appeal of his conviction comes directly to the Supreme Court pursuant to Indiana Appellate Rule 4(A)(1)(a).[8]

## Standard of Review

"When reviewing the sufficiency of the evidence to support a conviction, 'appellate courts must consider only the probative evidence and reasonable inferences *supporting* the verdict.'" Drane v. State, 867 N.E.2d 144, 146 (Ind. 2007) (quoting McHenry v. State, 820 N.E.2d 124, 126 (Ind. 2005)) (emphasis added in Drane). Reviewing courts should not "assess witness credibility and weigh the evidence to determine whether it is sufficient to support a conviction." Drane, 867 N.E.2d at 146 (citing Wright v. State, 828 N.E.2d 904, 905-06 (Ind. 2005)). Convictions should be affirmed unless "no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt." Drane, 867 N.E.2d at 146-47 (quoting Jenkins v. State, 726 N.E.2d 268, 270 (Ind. 2000)).

## Discussion

In the present case, Moore raises a particular insufficiency of evidence claim. Moore argues that the State primarily relied upon the testimony of three witnesses at trial: Jermon Gavin, Joseph Buti, and Steven Martin. Moore asserts that the testimony of these three witnesses was "so

---

[8] "(1) *Mandatory review*. The Supreme Court shall have mandatory and exclusive jurisdiction over the following cases: (a) Criminal Appeals in which a sentence of death or life imprisonment without parole is imposed under Ind. Code § 35-50-2-9. . . ." Ind. Appellate Rule 4(A)(1)(a).

contradictory, as to meet the doctrine of incredible dubiosity." (Appellant's Br. at 8.) The incredible dubiosity rule allows the Court to "impinge upon a jury's responsibility to judge the credibility of the witnesses only when confronted with 'inherently improbable' testimony." (Appellant's Br. at 8 (citing Tillman v. State, 642 N.E.2d 221, 223 (Ind. 1994)).) The incredible dubiosity rule is only applied in limited circumstances. Accordingly, we first address the appropriate scope of the incredible dubiosity rule before reaching a conclusion on its applicability to Moore's claim.

## I. Incredible Dubiosity Rule

In Gaddis v. State, this Court was confronted with a jury verdict that could not be supported by the evidence presented at trial. 253 Ind. 73, 81, 251 N.E.2d 658, 662 (1969). In Gaddis, the defendant was charged and found guilty of robbery. Id. at 74, 658. The defendant contended that the identification testimony of the State's eyewitness was insufficient to meet the required standard of proof for a criminal conviction. Id. at 75, 659. On review, the Court first acknowledged that it must be "careful not to confuse its function and purpose with that of the trial court," but it must also "be equally as careful not to be found in derogation of [its] duties as an appellate tribunal, monitoring with a watchful eye the administration of justice on the trial court level." Id. at 76, 659.

In Gaddis, on the night a gas station was robbed, the police arrested a suspect, brought the suspect back to the gas station, and asked the attendant to identify the suspect. Id. at 75, 659. The gas station attendant did identify the suspect as the robber and subsequently served as the chief prosecuting witness at trial. Id. at 77, 660. When asked at trial if the suspect brought in by police was the same man who had held him up, the witness responded, "He looked like the man, sir." Id. When asked if the witness believed it was the same man, the witness testified, "Well, I was too shook up and rattled that night, I couldn't tell you for sure if it was or not." Id. The witness continued to go back and forth regarding whether he was positive that the defendant was the same man who had held him up, and admitted that authorities had threatened him that he would go to the penitentiary if he did not testify against the defendant. Id. at 77-79, 660-61. The Court noted

7

that on top of the threats of imprisonment from the police, the witness had also been threatened by the defendant if he did testify. Id. at 79, 661. Ultimately, the Court found the witness's testimony to be "vacillating, contradictory and uncertain." Id. There was also a lack of any circumstantial evidence linking the defendant to the crime. Id. And there were additional conflicts between the witness's testimony and the evidence produced at trial that were never reconciled. Id. at 79-80, 661. Where the State's chief witness "by his own admission is unsure as to the identity of the criminal, and where other evidence *or lack thereof* would support such uncertainty, this court would hold that such identification, as a matter of law, is insufficient evidence, by itself," to convict the defendant of the crime. Id. at 80, 661-62. As such, the Court concluded that "the evidence of guilt . . . containing as it does the ingredients of *uncredible dubiosity*,[9] falls far short of proof beyond a reasonable doubt." Id. at 81, 662 (emphasis added).

Since Gaddis, this Court has defined the limited scope of the incredible dubiosity rule. "Under this rule, a court will impinge on the jury's responsibility to judge the credibility of the witnesses only when it has confronted 'inherently improbable' testimony or coerced, equivocal, wholly uncorroborated testimony of 'incredible dubiosity.'"[10] Tillman, 642 N.E.2d at 223 (citing Rodgers v. State, 422 N.E.2d 1211, 1213 (Ind. 1981)) (internal quotations and citations omitted). The application of this rule is restricted to facts similar to those in Gaddis. Tillman, 642 N.E.2d at 223 (citing Gaddis, 253 Ind. at 82, 251 N.E.2d at 663)). A court will only impinge upon the jury's duty to judge witness credibility "where a *sole witness* presents inherently contradictory

---

[9] "Dubiety" or "dubiosity" is defined as, "[t]he quality or condition of being dubious" or "an uncertainty." WEBSTER'S II NEW COLLEGE DICTIONARY, p.349, (1995). "Dubious" is defined as, "[c]ausing doubt or uncertainty: Equivocal." Id.

[10] As demonstrated in Tillman, precedent that subsequently relied on Gaddis corrected the usage of "uncredible" to "incredible."

8

testimony which is equivocal or the result of coercion and there is a *complete lack of circumstantial evidence* of the appellant's guilt." Id. (emphases added).

A more recent case demonstrates that even when there is a single eyewitness, the incredible dubiosity rule may not apply. In Murray v. State, the defendant challenged the sufficiency of his murder conviction as being based upon the incredibly dubious testimony of one witness. 761 N.E.2d 406, 408 (Ind. 2002). The Court recognized that the witness's testimony had been inconsistent with pre-trial statements and was at odds with the testimony of corroborating witnesses, but this did not necessarily make the testimony incredibly dubious. Id. at 409. The witness's testimony was not equivocal, no contradictions occurred on the witness stand, and even though the testimony differed from the defendant's, "[i]t is for the trier of fact to resolve conflicts in the evidence and to decide which witnesses to believe or disbelieve." Id. (quoting Kilpatrick v. State, 746 N.E.2d 52, 61 (Ind. 2001)). The Court held that the incredible dubiosity rule was inapplicable. Murray, 761 N.E.2d at 409.

In Edwards v. State, this Court again determined that the incredible dubiosity rule was inapplicable. 753 N.E.2d 618, 622 (Ind. 2001). In Edwards, the witness's testimony during trial was consistent, and although the witness considered changing his testimony during trial, the jury was made aware of that fact during cross-examination. Id. at 622-23. The potential uncertainty of the witness's testimony "was put squarely before the jury, [and] the jury had the ability to perform its role as a trier of fact and determine the extent to which it affected the integrity of [the witness's] testimony." Id. at 623 (citing Albrecht v. State, 737 N.E.2d 719, 733 (Ind. 2000)). Accordingly, this Court has explained that while incredible dubiosity provides a standard that is "not impossible" to meet, it is a "difficult standard to meet, [and] one that requires great ambiguity and inconsistency in the evidence." Edwards, 753 N.E.2d at 622. "The testimony must be so convoluted and/or contrary to human experience that no reasonable person could believe it." Id. (citing Campbell v. State, 732 N.E.2d 197, 207 (Ind. Ct. App. 2000)).

Other jurisdictions have applied a similar rule, sometimes referred to as the "inherent improbability doctrine." See State v. Robbins, 210 P.3d 288, 295 (Utah 2009). In Robbins, the

9

Utah Supreme Court explained that although a court usually must accept a jury's determination of witness credibility, "when the witness's testimony is inherently improbable, the court may choose to disregard it." 210 P.3d at 293 (citing State v. Workman, 852 P.2d 981, 984 (Utah 1993)). Under this standard, the Court held that the definition of "inherently improbable must include circumstances where a witness's testimony is incredibly dubious and, as such, apparently false." Robbins, 210 P.3d at 293. Similar to the incredible dubiosity rule, the application of this rule requires that: "(1) there are material inconsistencies in the testimony and (2) there is no other circumstantial or direct evidence of the defendant's guilt." Id. at 294. "The existence of any additional evidence supporting the verdict prevents the judge from reconsidering the witness's credibility." Id. See also State ex. rel. Mochnick v. Andrioli, 216 Iowa 451, 453, 249 N.W. 379, 380 (1933) (explaining that "[t]he rule that it is for the jury to reconcile the conflicting testimony of a witness does not apply where the only evidence in support of a controlling fact is that of a witness who so contradicts himself as to render finding of facts thereon a mere guess").

Accordingly, the appropriate scope of the incredible dubosity rule as utilized in Indiana and other jurisdictions requires that there be: 1) a sole testifying witness; 2) testimony that is inherently contradictory, equivocal, or the result of coercion; and 3) a complete absence of circumstantial evidence. Accordingly, this standard will be applied in determining whether Moore's convictions merit reversal based upon the testimony offered at his trial.

## II.     Sufficiency of Evidence for Moore's Convictions based upon the Incredible Dubiosity Rule

In the current case, Moore argues the testimony of Gavin, Buti, and Martin cannot be believed. Even though Moore concedes that each of those men agreed that "Moore was the shooter," they disagreed on "several significant matters." (Appellant's Br. at 8.) Moore specifically asserts that the testimony was inconsistent regarding: 1) "who had the problem with Alex Tinoco"; 2) "who passed the gun to Moore"; 3) "how Buti got home"; 4) "how Moore got home"; 5) "who ditched the gun and when"; 6) "how proceeds [from the robbery] were split"; and 7) "whether Buti knew Alex." (Appellant's Br. at 8-9.) While Moore is able to point out some

inconsistencies among the testimonies of the witnesses, he fails to demonstrate that the application of the incredible dubiosity rule is warranted.

First, the application of this rule has been restricted to cases where there is a single testifying witness. See Tillman, 642 N.E.2d at 223 (reiterating that the application of this rule "is limited to cases . . . where a *sole witness* presents inherently contradictory testimony . . . .") (emphasis added). Although Buti was the only eyewitness to the shooting, Gavin's testimony also placed Moore at the scene. Gavin drove Moore to Tinoco's house and saw something wrapped in a white cloth passed back to Moore. Soon after shots were fired, Gavin recalled Moore running back to the vehicle. Moore was sweaty, nervous, and out of breath when he got into the car, and Gavin saw Moore hand White a gun. Gavin also testified that Moore had called him later that same night and threatened Gavin by stating that the same thing that happened to Tinoco and Conlee could happen to him, Buti, and White. Additionally, Steven Martin met Moore in jail, and he testified that Moore confessed to the shootings. Moore explained to Martin that he struggled with Tinoco at the door, shot him, and then when he saw Conlee upon entering the house, he had to shoot her too because she was a witness.

There were also corroborating witnesses. Kagimbi identified the person he saw on the television monitor as the same person who followed him when he fled out the back. Kagimbi was certain that whoever first came to the door was not the same person who shot Tinoco and Conlee. Because Kagimbi fled out the back door after the first shot, the person responsible for the shooting would not have had time to shoot Tinoco, enter the house, shoot Conlee, and already be outside again by the time Kagimbi was exiting the house. Kagimbi was also certain that Moore was not the person he had seen on the television monitor. Johnson also saw two different individuals near Tinoco's house around the time of the shooting. Johnson saw a man in dark clothes go onto the porch, he heard two gunshots, and then saw the same man leave the porch and get into a silver vehicle. Gavin was driving a silver Pontiac Grand Prix that night.

The defense presented two witnesses who testified that someone else was responsible for the murders. Gavin's girlfriend, who had been with Gavin after the shooting, testified that she

11

thought that Buti was involved in the shooting. Additionally, Timothy Whitfield, who was a jail mate of Moore's and later Gavin's, testified that Gavin confessed to carrying out the shooting with Moore. However, Whitfield testified that both Moore and Gavin were the shooters. Thus, even if Whitfield's testimony were believed, it still implicated Moore as being directly involved in the shootings.[11]

As discussed above, the first factor of the incredible dubiosity rule has not been met because there were multiple testifying witnesses that the jury could have relied upon in reaching its verdict. The testimony of multiple witnesses aligns this case with Murray, where the court explained, "[i]t is for the trier of fact to resolve conflicts in the evidence and to decide which witnesses to believe or disbelieve." 761 N.E.2d at 409 (quoting Kilpatrick, 746 N.E.2d at 61). The contradictions among testifying witnesses in the present case are indistinguishable from any other case where the jury has the duty to assess the credibility of witnesses.

Because the testimony of multiple witnesses alone precludes the application of the incredible dubiosity rule, our analysis could end here. Against the request of Moore, we are not inclined to expand the rule's application to situations where there are multiple testifying witnesses. Even if this Court were to consider applying the incredible dubiosity rule in the context of multiple witnesses, this case would not be the appropriate case to do so. As explained below, the other two factors necessary for the application of the incredible dubiosity rule are also lacking. As such,

---

[11] The prosecution also called into question the reliability of Whitfield's testimony by raising that Whitefild believed that Moore was involved in the killing of one of Whitfield's friends, and as a result Moore and Whitfield had gotten into a physical altercation when in jail together.

12

even if the rule was expanded to encompass cases involving multiple witnesses, Moore's claim that incredible dubiosity precludes the guilty verdicts still must fail.[12]

The second factor is whether the witness' testimony is inherently improbable, contradictory, or coerced, resulting in the testimony being incredibly dubious. See Tillman, 642 N.E.2d at 223. Here, there are no inconsistencies in the testimonies of Buti, Gavin, or Martin. Buti was the prosecution's primary eyewitness. He consistently testified that he saw Moore shoot Tinoco and enter the house. Buti acknowledged that when he originally talked to police about the incident he did not tell the full truth, and he explained that he had lied out of fear. However, when Buti testified at trial he never changed his story, and he identified Moore as the shooter from the beginning.

Once again, these facts are similar to those in Murray. In Murray, the witness made statements prior to trial that were inconsistent with the trial testimony, but there were no inconsistencies in the witness's testimony at trial. 761 N.E.2d at 409. The Court concluded that even if the trial testimony is inconsistent with pre-trial statements, that does not necessarily make the testimony at trial incredibly dubious. Id. See also Stephenson v. State, 742 N.E.2d 463, 498 (Ind. 2001) (explaining that even though the State's sole eyewitness had discrepancies in his statements to police, in depositions, and in his trial testimony, "witness testimony that contradicts [the] witness's earlier statements does not make such testimony 'incredibly dubious,'" when that witness "unequivocally identified Defendant as the perpetrator who shot the three victims. . . .") (internal citation omitted). We agree with the conclusion in Murray. Buti's testimony at trial remained consistent, and any inconsistent pre-trial statements were brought to the attention of the jury. See Edwards, 753 N.E.2d at 623 (concluding that when a witness considered changing his testimony during the trial, "the jury was made aware of this fact during cross-examination . . .

---

[12] In addition, discussion of the remaining factors demonstrates why Moore would also not have prevailed had he brought a standard sufficiency of the evidence claim, instead of a claim of incredible dubiosity.

[and] the jury had the ability to perform its role as a trier of fact and determine the extent to which it affected the integrity of his testimony").

Accordingly, Buti's testimony does not rise to the level of incredible dubiosity. Gavin and Martin also did not waiver in their testimony at trial. Both individuals maintained that Moore was responsible for the shootings. Nothing within these testimonies were factually impossible or even improbable. To the contrary, the witnesses explain the occurrence of these unfortunate shootings in an easily comprehensible way: drug dealing gone wrong.

It is not disputed that the three witnesses disagreed on some details, such as who had it in for Tinoco, who handed Moore the gun, what happened to the gun after the shooting, and where each person went after the shooting. Again, inconsistencies among the testimonies of the witnesses merely puts the burden upon the jury to determine which witness to believe. See Ferrell v. State, 746 N.E.2d 48, 51 (Ind. 2001) (explaining that the incredible dubiosity rule was inapplicable even when the witness's testimony was inconsistent in several respects with the testimony of other witnesses, but the testimony was not equivocal and the witness never contradicted himself on the stand); See also Berry v. State, 703 N.E.2d 154, 160 (Ind. 1998) (refusing to apply the incredible dubiosity rule where the witnesses contradicted each other but no single witness contradicted himself).

Additionally, the prosecution provided a valid explanation of why these witnesses had some inconsistencies between their testimonies. The prosecution addressed the obvious fact that each of the witnesses' memories had likely faded over the year and a half between the night of the murders and the trial. But more importantly, the prosecution also emphasized that Buti and Gavin were both motivated to downplay the extent of their own involvement. Both Gavin and Buti admitted to being at the scene, but both logically want to avoid facing criminal charges themselves. Thus, it is understandable that Gavin would not admit to being the person who handed Moore a gun and that neither witness would admit to being the person who initiated a plan to rob Tinoco. At the time of this trial, Gavin was already being held at St. Joseph County Jail on charges for

felony murder and robbery related to this case. Thus, a reasonable jury could have believed that this was a valid explanation of the inconsistencies between the witnesses' testimonies.

Finally, as Moore concedes, there is circumstantial evidence in this case. In a case where there is circumstantial evidence of an individual's guilt, "reliance on the incredible dubiosity rule is misplaced." Majors v. State, 748 N.E.2d 365, 367 (Ind. 2001) (citing White v. State, 706 N.E.2d 1078, 1080 (Ind. 1999)). In the present case, there were bloody shoeprints at the scene of the crime, and those prints were narrowed down to seven different tread patterns. Shoes from a variety of individuals who may have been in the house that night were tested, including firemen, friends, and family. Moore's shoes were the same pattern of shoe, same size, and same kind of wear as prints left inside the house. Furthermore, the shoe patterns collected were not consistent with either Buti, Gavin, or White's shoes. Moore's shoes were also tested for the presence of blood, and a preliminary test indicated that the shoes may have had blood on them.[13]

Additionally, a presumptive test for blood was conducted on the floor mats of the vehicle Gavin was driving the night of the shooting. A test of the floor mat where only Moore had sat was positive for potential blood, while all the other floor mats in the vehicle gave no positive indication for the presence of blood. The floor mat which showed indications of blood was also tested for DNA. The major DNA profile obtained from testing the floor mat matched Tinoco's DNA. This test also excluded Buti, Gavin, and White as possible contributors to the DNA on the floor mats. Finally, a do-rag was found at the scene, and swabs of the do-rag provided a major DNA profile that matched Moore. The DNA found on the do-rag excluded Buti, Gavin, and White as potential contributors.

---

[13] Even though this was a very sensitive test, it could still provide some indication of Moore's potential involvement.

None of the factors that are necessary to warrant the application of the incredible dubiosity rule are present in the case before us. Again, two witnesses consistently testified that Moore was the shooter, other witnesses corroborated this testimony, and circumstantial evidence linked Moore to the scene. See Turner v. State, 953 N.E.2d 1039, 1060 (Ind. 2011) (holding that the incredible dubiosity rule did not apply "because (a) [the witness's] trial testimony was not inherently contradictory, (b) the evidence was not from a single witness, and (c) there was not an absence of circumstantial evidence of guilt"). Under the present circumstances, it would be inappropriate for this Court to "impinge on the jury's responsibility to judge the credibility of the witnesses. . . ." Tillman, 642 N.E.2d at 223.

## Conclusion

The incredible dubiosity rule is inapplicable in the present case and cannot serve as grounds for overturning the jury's verdict. Furthermore, based upon the evidence presented at trial, a reasonable jury could have found each element of murder and felony murder beyond a reasonable doubt. Accordingly, there was sufficient evidence for Moore's convictions. The convictions and sentences entered by the trial court are affirmed.

Rush, C.J., Dickson, Rucker, and Massa, J.J., concur.