

**FILED**

Oct 19 2016, 7:25 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

| ATTORNEY FOR APPELLANT | ATTORNEYS FOR APPELLEE |
|---|---|
| Kurt A. Young<br>Nashville, Indiana | Gregory F. Zoeller<br>Attorney General of Indiana |
| | James B. Martin<br>Deputy Attorney General<br>Indianapolis, Indiana |

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Ryan Clark,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | October 19, 2016<br><br>Court of Appeals Case No.<br>49A04-1601-CR-184<br><br>Appeal from the Marion Superior Court<br><br>The Honorable Kurt M. Eisgruber, Judge<br><br>Trial Court Cause No.<br>49G01-1406-FA-029404 |

**Pyle, Judge.**

# Statement of the Case

Following his participation in a horrific home invasion, Ryan Clark ("Clark") was convicted of the following sixteen offenses: (1) two counts of rape as Class A felonies; (2) three counts of criminal deviate conduct as Class A felonies; (3) five counts of confinement as Class B felonies; (4) one count of robbery as a Class C felony; (5) one count of carjacking as a Class C felony; (6) two counts of battery as Class C felonies; and (7) two counts of battery as Class A misdemeanors. He now appeals those convictions and argues that the evidence is insufficient to support them. Specifically, he contends that the testimony of victim A.M. ("A.M.") was incredibly dubious. Finding that the incredible dubiosity rule does not apply in this case, we affirm Clark's convictions.

Affirmed.

# Issue

Whether there is sufficient evidence to support Clark's convictions.

# Facts

In September 2013, A.M. was sitting on her back patio when three men wearing bandanas and clear plastic gloves approached her and ordered her into her house at gunpoint. A.M. was subsequently ordered to go upstairs where she joined her husband and three children, sixteen-year-old twin sons and a seven-year-old son.

[4]     While the family was in the upstairs bedroom, Clark told A.M. she had nice breasts and ordered her to remove her shirt. When A.M. refused to do so in front of her family, Clark pointed his gun at her face and ordered her, her husband, and her children to all remove their shirts. This time everyone complied with Clark's order. Although Clark's face was partially covered by the bandana, A.M. was able to look at his eyes, which were illuminated by a hall light.

[5]     The family was then ordered to go downstairs to the living room. At this point, none of the men were wearing their bandanas, and, as the family went down the stairs, A.M. was able to get a good look at Clark's face, which was illuminated by a bright light. When everyone got to the living room, Clark ordered A.M. to remove all of her clothes. When she again refused to do so in front of her family, Clark ordered the entire family to "strip down naked" as he pointed his gun at A.M. (Tr. 39). The family again complied with Clark's order.

[6]     While the other gunmen loaded the family's car with electronics, one of the men took A.M. to the laundry room in the basement. Shortly thereafter, the other two men joined them. All three men then ordered A.M. to perform oral sex on them at gunpoint. At one point, A.M. opened her eyes and noticed a birthmark on one of the men's hip. A.M. was then taken to an adjacent bathroom where each of the men raped her. Clark, who was no longer wearing a bandana, then dragged A.M. over to the shower and poured soap and bleach on her "to wash all the DNA off." (Tr. 111). Clark briefly left A.M. in the

shower, and when he returned and saw A.M. peeking out, Clark punched her in the face two times. At that moment, A.M. was just inches from Clark's face, and she got a good look at his face, which was illuminated by the bathroom light.

[7] Clark then dragged A.M. out of the shower and into the basement bedroom, where her family was sitting. While Clark and the other men were discussing what to do with the family, A.M. got another good look at Clark's face, which was illuminated by the bedroom light. A.M. was only three feet away from Clark, who was not wearing a bandana. After threatening to kill the family if anyone contacted the police, the three men left in the family's car with the family's laptops, video games and consoles, and televisions.

[8] Despite the threat on their lives, the family immediately contacted the police. After arriving at the scene, one of the officers found a clear plastic glove during a search of the house. Testing on the glove revealed the DNA of Shayne Thompson ("Thompson"), who was the father of Clark's sister's baby. Clark and Thompson had been seen together the week of the home invasion.

[9] In an attempt to identify the intruders, A.M. looked at 150 photographs over a three-month period. When A.M. saw Clark's picture, she said, "Oh, my God, that's him." (Tr. 492). She had no doubt about her identification.

[10] Clark was initially charged in a twenty-three count information; however, the State dismissed two of the counts. At Clark's trial, A.M. identified Clark and testified about the events of the home invasion. She responded as follows when

asked why it was important for her to remember what the intruders looked like: "Because I knew that I had to remember. If I could, I should. . . . That they might find who did it, and I needed to know and remember what they looked like." (Tr. 150-51). Photographs admitted at trial revealed that Clark had a birthmark on his hip matching the one seen by A.M. during one of the sexual assaults. Father also testified about the home invasion; however, because his glasses were knocked off of his face, Father's vision was "fuzzy" and he was unable to identify the intruders. (Tr. 282). The children did not testify.

[11] A jury convicted Clark of the remaining twenty-one counts. The trial court vacated several of the convictions and sentenced Clark to 104 years. Clark now appeals his convictions.

## Decision

[12] Clark argues that the evidence is insufficient to support his convictions because A.M.'s testimony was incredibly dubious. The incredible dubiosity rule recognizes that, in very rare cases, a witness' credibility is so untrustworthy and lacking as to justify reversal on appeal. *Moore v. State*, 27 N.E.3d 749, 755 (Ind. 2015). In *Moore*, the Indiana Supreme Court explained that we should only invoke this doctrine "where a *sole witness* presents inherently contradictory testimony which is equivocal or the result of coercion and there is a *complete lack of circumstantial evidence* of the appellant's guilt." *Id.* (emphases in original). This standard is not an impossible burden to meet, but it is a difficult one, and

the testimony must be such that no reasonable person could believe it. *Id.* at 756.

[13] Here, our review of A.M.'s testimony reveals that the incredible dubiosity rule simply does not apply in this case. A.M.'s testimony was not inherently contradictory. She never wavered in her identification of Clark and had several opportunities to view his uncovered face, including three times in well-lit conditions. Further, the identifiable mark on Clark's hip as well as DNA evidence implicating his friend provided circumstantial evidence of Clark's guilt. Clark's suggestions that A.M. was too distraught to make a reliable identification or that there was not enough light for her to clearly see the intruders are requests for us to reweigh the evidence. This we cannot do. *See Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007) (appellate courts do not reweigh evidence or judge credibility of witnesses). As a result, there is sufficient evidence to support Clark's convictions.

[14] Affirmed.

Bradford, J., and Altice, J., concur.