## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Apr 30 2018, 7:14 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Justin R. Wall
Wall Legal Services
Huntington, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Lee M. Stoy, Jr.
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Brandan Lee Eakright,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

April 30, 2018

Court of Appeals Case No.
85A02-1710-CR-2577

Appeal from the Wabash Circuit Court

The Honorable Robert R. McCallen, III, Judge

Trial Court Cause No.
85C01-1501-F5-48

**Barnes, Judge.**

# Case Summary

Brandan L. Eakright appeals his conviction and sentence for Level 5 felony sexual misconduct with a minor. We affirm.

# Issues

The issues before us are:

    I.     whether the evidence is sufficient to sustain his conviction for Level 5 felony sexual misconduct with a minor; and

    II.    whether his sentence is inappropriate.

# Facts

On New Year's Eve 2014, fourteen-year-old A.M. asked her parents to let her visit her great-grandmother in Wabash; they agreed. Once there, A.M. asked her great-grandmother for permission to visit Courtney Erwin, her twenty-three-year-old friend, whose children A.M. occasionally baby-sat. Courtney often bought alcohol for A.M. and drank with her. Late that evening, Courtney picked A.M. up, purchased alcohol, and drove to her trailer so they could drink with Courtney's boyfriend, Jared Eakright ("Jared"). Jared was Brandan Eakright's (Eakright) cousin. Jared invited Eakright to join them, and Eakright arrived before midnight.

A.M. had met Eakright once before in the Fall of 2014. Eakright was twenty-nine years old, 6' 6", and weighed 200 pounds. That night, A.M., who was 4' 9" inches tall and weighed eighty-five pounds, drank more alcohol than she had

ever consumed before. The foursome drank, played cards, and retired to the living room. They drank "[e]nough that [they] were [all] drunk." Tr. Vol. II p. 220.

[5] Jared and Courtney eventually went to bed, leaving A.M. and Eakright on the living room sofa with a blanket over them. Eakright placed A.M.'s hand on his penis over his clothing. A.M. "froze." *Id*. at 144. Eakright then kissed her mouth, fondled her bare buttocks, and rubbed her vagina. Each time, A.M. told Eakright to stop. At least three or four times, he would briefly stop, only to resume trying to kiss her and touching her buttocks and vagina. A.M. eventually moved to the other end of the sofa. Eakright put on his shoes, said he was sorry, and left.

[6] A.M. went into Courtney's bedroom and shook Jared until he told her the address of the trailer. She did not tell Jared what his cousin had done. Afraid to call her parents, who thought she was with her great-grandmother and not out drinking with adults, A.M. called her friend, Payton Helton, in Peru. She was crying so much that Payton could not understand her. He hung up and sent her a text. A.M. replied that "a guy was touching [her]." *Id*. at 172. Payton drove to Wabash to pick A.M. up. A.M. then called her friend Bethany Caldwell's parents. "[A.M.] was upset, crying, [and] asked if she could come to the [Caldwells'] house" because she "needed somewhere to go now." Tr. Vol. III p. 30. Payton drove A.M. to the Caldwells' house, and they called her parents and the police.

[7] On January 1, 2015, North Manchester Police Department Chief James Kirk, formerly a detective-captain with the Wabash Police Department, investigated the allegation. He interviewed A.M. and accompanied her and her parents to the Fort Wayne Sexual Assault Center, where A.M. underwent a rape kit examination. On January 5, 2015, Chief Kirk interviewed Eakright, who made a videotaped confession; however, Eakright later recanted, claiming his confession was coerced and prompted by fear and exhaustion.

[8] On January 23, 2015, the State charged Eakright with Level 5 felony sexual misconduct with a minor and Class A misdemeanor contributing to the delinquency of a minor. He was tried by a jury on February 9, 2016, resulting in a partial mistrial when the jury found Eakright not guilty of contributing to the delinquency of a minor, but deadlocked as to the Level 5 felony charge.

[9] He was retried as to the Level 5 felony charge on September 26, 2017. During the State's case-in-chief, A.M. testified to the foregoing facts. Courtney testified that she woke at approximately 6:00 A.M. on New Year's Day and was "just really shocked" to "find this note" from A.M., and "neither one of them [Eakright or A.M.] there." Tr. Vol. II p. 198-99. She testified further that she "thought something had happened to [A.M.] . . . . [S]he had never done that before." *Id*. at 199. Bethany's mother, Brandi Caldwell, testified that she called the police and A.M.'s parents after a "frantic" and "bawling" A.M. arrived at her house on New Year's Day 2015. Tr. Vol. III p. 32.

Chief Kirk testified that he interviewed Eakright. The jury watched the video-recording of Eakright's interview, in which Eakright confessed to putting his hand in A.M.'s pants and rubbing her vagina and buttocks. Chief Kirk testified that during the interview, "[Eakright] started thinking about what he did," and began to cry. Tr. Vol. III p. 12. Meredith Livingston, forensic DNA analyst at the Indiana State Police laboratory, testified that DNA evidence retrieved from A.M.'s face, cheek, and lips was "consistent with . . . Brandan Eakright" such that "[he] and all of his male paternal relatives cannot be excluded as potential" contributors. *Id*. at 242.

During his testimony, Eakright denied kissing A.M. or touching her buttocks and vagina. On direct examination, the following colloquy ensued:

> Q: Okay. We saw video of your interview with Detective Kirk. Was that pretty accurate in terms of what happened?
>
> A: Yeah.
>
> Q: Ultimately, you indicate you don't remember what happened and then seem to indicate, yes, I kissed her, yes, I rubbed her vagina. You saw that, right?
>
> A: Yeah, I seen [sic] it.
>
> Q: Why did you say that?
>
> A: I was in shock. I didn't know what to think. I didn't know what to say. . . . I never dealt with anything like that before. And I didn't know how to handle it.

*Id*. at 87-88. At the close of the evidence, the jury returned a guilty verdict.

[12] At Eakright's sentencing hearing on October 23, 2017, the trial court found no aggravating circumstances and, after considering Eakright's lack of criminal history, concluded that factor was not mitigating. The trial court ordered Eakright to serve three years in the Department of Correction with six months suspended to probation; he now appeals.

## Analysis

### I.  *Sufficiency of the Evidence*

[13] Eakright argues that the evidence is insufficient to sustain his conviction because A.M.'s testimony was incredibly dubious. He argues,

> A.M. is the only single witness to provide even a shadow of testimony that implicates Eakright of committing the crime as alleged. Her testimony is unsupported by any circumstantial evidence, other than potentially inconclusive DNA evidence, or by testimony of any other witness who heard or saw the alleged event occurring. Additionally, A.M.'s testimony was contradictory and convoluted at time and her recollection . . . was clearly clouded by her intoxication and fueled by potential criminal mischief and/or punishment that she could have faced.

Appellant's Br. p. 24. When reviewing the sufficiency of the evidence needed to support a criminal conviction, we neither reweigh evidence nor judge witness credibility. *Bailey v. State,* 907 N.E.2d 1003, 1005 (Ind. 2009). "We consider only the evidence supporting the judgment and any reasonable inferences that can be drawn from such evidence." *Id*. We will affirm if there is substantial

evidence of probative value such that a reasonable trier of fact could have concluded the defendant was guilty beyond a reasonable doubt. *Id*.

[14] To convict Eakright of Level 5 felony sexual misconduct with a minor, the State was required to prove that he, "a person at least eighteen (18) years of age," did "perform[ ] or submit[ ] to sexual intercourse or other sexual conduct (as defined in IC 35-31.5-2-221.5)" with A.M., who was "a child at least fourteen (14) years of age but less than sixteen (16) years of age." *See* Ind. Code § 35-42-4-9(a).

[15] Under the incredible dubiosity rule, we may "impinge on the jury's responsibility to judge the credibility of the witness only when it has confronted 'inherently improbable testimony or coerced, equivocal, wholly uncorroborated testimony of incredible dubiosity.'" *Young v. State,* 973 N.E.2d 1225, 1226 (Ind. Ct. App. 2012) (quoting *Rodgers v. State,* 422 N.E.2d 1211, 1213 (Ind. 1981)), *reh'g denied, trans. denied*. In Indiana, the rule of incredible dubiosity requires that there be: "1) a sole testifying witness; 2) testimony that is inherently contradictory, equivocal, or the result of coercion; and 3) a complete absence of circumstantial evidence." *Moore v. State,* 27 N.E.3d 749, 756 (Ind. 2015). This rule is rarely applicable and should be applied only if the alleged victim's "testimony is so incredibly dubious or inherently improbable that no reasonable person could believe it." *See Rose v. State,* 36 N.E.3d 1055, 1061 (Ind. Ct. App. 2015). The witness's testimony must run "counter to human experience." *Campbell v. State,* 732 N.E.2d 197, 207 (Ind. Ct. App. 2000).

[16] Eakright contends that the incredible dubiosity rule applies because:

> ultimately, the DNA sampling and testing could not prove, nor disprove, that Eakright committed the alleged act. At best, . . . Eakright could not be excluded, nor could any of his male relatives be excluded[;]

> \* \* \* \* \*

> [H]is 'confession' [wa]sn't a true confession and was induced by the nature of the circumstances of the interview, the unfamiliar surroundings, the pressure from Chief Kirk, lack of sleep and flat out being scared and just wanting to get the interview process over with[; and]

> \* \* \* \* \*

> [T]hrough much of A.M.'s testimony, she cannot recall a lot of the facts of what happened and undertook no actions . . . to have prevented touching or at least to have stopped the touching as alleged . . . . [And] A.M.'s actions and statement during that course of the night seem very much to be convoluted and inconsistent with someone who has allegedly been touched inappropriately[.]

> \* \* \* \* \*

> A.M. had started . . . that night by lying to her mother, obtaining money for alcohol from her great-grandmother, under false pretenses, going to a residence that she did not have permission to go to, consuming alcohol underage with adults, consuming such a quantify [sic] of alcohol sufficient to cause her to vomit . . . . A.M.'s version of events that night was concocted to . . . get

her out of potential criminal trouble, or . . . trouble with her mother and/or great-grandmother.

Appellant's Br. p. 19, 20, 22, 24.

[17] None of Eakright's arguments render A.M.'s testimony inherently improbable or incredibly dubious. A.M. was the only eyewitness to the underlying sexual acts, as is common in cases involving sex crimes. The record shows her to be a consistent and confident witness. She testified unequivocally that Eakright kissed her and tried to kiss her, placed her hand on his penis over his clothing, touched her buttocks, and rubbed her vagina. She also testified that she repeatedly told him to stop, but he repeated his actions three or four times.

[18] In invoking the incredible dubiosity rule, Eakright seizes upon the fact that A.M. cannot recall whether he digitally penetrated her vagina. Given her slight eighty-five-pound frame, her heavy alcohol consumption that night, and her testimony that she "passed out" at one point, it is not inherently improbable that she might not recall Eakright's every action against her. *See* Tr. Vol. II p. 145. Eakright also makes much of the fact that A.M. did not immediately wake Courtney and Jared or call her parents to report his sexual misconduct. It is not inconsistent with the laws of human nature or experience that A.M. was reluctant to report Eakright to his cousin or was afraid to call her parents after a night of underage drinking. The jury was free to decide whether "to believe or disbelieve" A.M. *See Murray v. State*, 761 N.E.2d 406, 409 (Ind. 2002).

Additionally, it is not uncommon for sexual abuse victims to be reluctant to report, to feel shameful and alone, or to be traumatized into silence by abuse.[1]

[19] Nor is there an absence of circumstantial evidence in this case. Circumstantial evidence alone can sustain a verdict "if that circumstantial evidence supports a reasonable inference of guilt." *Maul v. State,* 731 N.E.2d 438, 439 (Ind. 2000). Our Indiana Supreme Court has also held "where there is circumstantial evidence of an individual's guilt, reliance on the incredible dubiosity rule is misplaced." *Moore*, 27 N.E.3d at 759. A.M. testified that Eakright kissed and tried to kiss her as he fondled her. The State presented evidence that DNA evidence collected from A.M.'s face was consistent with Eakright's profile. While not conclusive, the State's DNA evidence was certainly corroborative.

[20] The foregoing facts are not so counter to human nature and experience that a reasonable jury could not have believed A.M.'s account. Nor is A.M.'s testimony "so incredibly dubious or inherently improbable that no reasonable person could believe it." *See Rose*, 36 N.E.3d at 1061. We conclude that the incredible dubiosity rule is inapplicable here and decline Eakright's invitation to invade the province of the jury by reweighing the evidence and reassessing witness credibility. *See Feyka v. State,* 972 N.E.2d 387, 394 (Ind. Ct. App. 2012). As a conviction of child molesting may rest on the uncorroborated testimony of

---

[1] After the underlying sexual abuse, a counselor diagnosed A.M. with post-traumatic stress disorder ("PTSD"). *See* Tr. Vol. III p. 148.

the victim, we hold the evidence was sufficient for the jury to find Eakright guilty of sexual misconduct with a minor. *See Young,* 973 N.E.2d at 1227.

## II. Sentence

[21] Eakright argues that his sentence is inappropriate. Indiana Appellate Rule 7(B) provides that we may revise a sentence authorized by statute if, after due consideration of the trial court's decision, we find that the sentence is inappropriate in light of the nature of the offenses and the character of the offender. When considering whether a sentence is inappropriate, we need not be "extremely" deferential to a trial court's sentencing decision. *Rutherford v. State,* 866 N.E.2d 867, 873 (Ind. Ct. App. 2007). Still, we must give due consideration to that decision. *Id.* We also understand and recognize the unique perspective a trial court brings to its sentencing decisions. *Id.* Under this rule, the burden is on the defendant to persuade the appellate court that his or her sentence is inappropriate. *Childress v. State,* 848 N.E.2d 1073, 1080 (Ind. 2006).

[22] The principal role of Rule 7(B) review "should be to attempt to leaven the outliers, and identify some guiding principles for trial courts and those charged with improvement of the sentencing statutes, but not to achieve a perceived 'correct' result in each case." *Cardwell v. State,* 895 N.E.2d 1219, 1225 (Ind. 2008). We "should focus on the forest—the aggregate sentence—rather than the trees—consecutive or concurrent, number of counts, or length of the sentence on any individual count." *Id.* When reviewing the appropriateness of a sentence under Rule 7(B), we may consider all aspects of the penal

consequences imposed by the trial court in sentencing the defendant, including whether a portion of the sentence was suspended. *Davidson v. State,* 926 N.E.2d 1023, 1025 (Ind. 2010).

[23] Eakright faced a term of one to six years, with an advisory sentence of three years. Ind. Code § 35-50-2-6(b). The trial court here found no aggravating or mitigating circumstances and imposed the advisory, three-year sentence with two and one-half years executed and six months suspended to probation.

[24] Eakright argues that "he qualifies for a reduced sentence" because the nature of the offense "is not particularly egregious due to the nature and location of the touch[ing] and [because there was allegedly] no penetration of A.M.'s private areas"; "the touching occurred over a short period of time on one evening"; alcohol was "potentially a driving factor"; and "A.M. appears to have had no long-term injuries," as evidenced by her "apparent success in school" and her ability to juggle being a high school senior, a cheerleader, and working a job. Appellant's Br. 27, 28. We disagree.

[25] Regarding the nature of the offense, twenty-nine-year-old Eakright—who was 6'6" and approximately 200 pounds—engaged in sexual conduct with and performed sexual acts upon A.M., a fourteen-year-old child, who was 4'9", weighed eighty-five pounds, and was acutely intoxicated. Undeterred by her protests, he kissed and tried to kiss her, placed her hand on his penis over his clothing, fondled her bare buttocks, and rubbed her vagina multiple times.

As for Eakright's character, despite his conviction by the jury, he failed to show remorse at his sentencing. He offers as evidence of his good character that he has no prior criminal history. We are not persuaded and regard the references in his brief to A.M.'s intoxication; her inability to recall "a lot . . . of what happened"; and her "undert[aking] no actions . . . to have prevented or . . . stopped the touching" as suggesting his belief that A.M., rather than himself, is accountable for their inappropriate interaction. *See* Appellant's Br. p. 22. We do not find, under the circumstances before us, that his character renders his advisory sentence inappropriate.

## Conclusion

The State presented sufficient evidence to support Eakright's conviction of Level 5 felony sexual misconduct with a minor. His sentence is not inappropriate.

Affirmed.

Najam, J., and Mathias, J., concur.