

FILED

Aug 18 2020, 9:27 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Ellen M. O'Connor
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

Steven Hosler
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Tyrone Jeffrey Toles,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

August 18, 2020

Court of Appeals Case No.
19A-CR-3017

Appeal from the
Marion Superior Court

The Honorable
Grant Hawkins, Judge

Trial Court Cause No.
49G05-1803-F1-9123

**Vaidik, Judge.**

## Case Summary

[1]     Tyrone Toles was convicted of attempted murder in connection with a
shooting. He appeals, arguing that the victim's testimony identifying him as the
shooter was not "reliable." But we do not judge the credibility of witnesses. The

only exception to this rule is the incredible-dubiosity doctrine. Tyrone[1] does not frame his argument as an incredible-dubiosity argument, but we treat it as such. Concluding that the victim's testimony was not incredibly dubious, we affirm Tyrone's conviction. To the extent Tyrone would have us adopt a separate "reliability" or "unreliability" test as an alternative to the incredible-dubiosity doctrine, we decline to do so.

# Facts and Procedural History

On February 28, 2018, Tyrone was moving his belongings out of his house in Indianapolis. He asked his friend, Mike Mahone, to help him lift the heavier objects out of the house. Tyrone also asked his cousin, Terrence Toles, to help. Terrence arrived later that evening, around 8:00 p.m., accompanied by his girlfriend, Channel Tyler. When Terrence and Channel arrived, Tyrone and Mike had finished moving. All four then participated in some combination of drinking beer and tequila, smoking marijuana, and snorting cocaine. Terrence, Mike, and Channel all consumed alcohol, marijuana, and cocaine while Tyrone drank only beer. The four stayed at Tyrone's house, partying late into the night. At some point, Terrence, Channel, and Mike drove to a gas station. Mike was looking for a ride home but ultimately decided not to have Terrence drive him home. All three individuals returned to Tyrone's house, and Terrence asked

---

[1] Because Tyrone Toles shares a last name with one of the other people involved, we refer to the individuals involved by their first names.

Channel to get more alcohol. While she was away, Terrence took her chair at the table in the living room. When Channel returned, she sat in the chair closest to the front door. More alcohol was consumed, and Channel asked Tyrone for more cocaine. She told Tyrone she would pay him later and consumed the cocaine. There were no arguments, but there were "words or something" exchanged between Terrence and Tyrone. Tr. p. 131. According to Channel, around 5:00 a.m., Tyrone attacked her, beating her and shooting her multiple times. Terrence fled the house through the back door. Channel crawled from the front door of Tyrone's house to a neighbor's house, and the police were called. When the police arrived on scene, Channel was rushed to the hospital. Her injuries included a broken jaw and gunshot wounds to her head, torso, arm, buttocks, and thigh. Terrence was later found at the back door of another neighbor's house with gunshot wounds to his abdomen and thigh.

[3] Evidence was collected immediately after the victims were sent to the hospital. There were spent shell casings on the floor of the living room, metal fragments collected from the living room and front porch, a shoebox with Aguila-manufactured .45 caliber ammunition for a handgun on the living-room table, and a Glock carrying case in the kitchen. A firearms expert determined that the shell casings found on the scene were manufactured by Aguila and Winchester. Three of the spent shell casings were of the Aguila brand, and all of the spent shell casings matched the caliber of the rounds found in the shoebox. The firearms expert also determined that the bullet jackets had the polygonal markings of a Bersa or Glock handgun.

[4] The State charged Tyrone with two counts of Level 1 felony attempted murder (one for Terrence and one for Channel), Level 4 felony unlawful possession of a firearm, and Level 6 felony escape.[2] A trial was held in July 2019. Tyrone and Channel testified, but Terrence and Mike did not. Ultimately, Tyrone was found guilty of unlawful possession of a firearm and escape. However, the jury hung on the two attempted-murder charges.

[5] A second trial on the attempted-murder charges was held in November 2019. Terrence again chose not to testify. Channel and Mike testified, and Tyrone's testimony from the first trial was introduced as an exhibit. All three presented different versions of what happened on the morning of March 1. Channel testified that around 1:00 or 2:00 a.m., Mike had someone pick him up to take him home. Then, at around 5:00 a.m., Tyrone pulled out a black handgun, shot it into the air, jumped on top of Channel, and began beating her and shooting her with the gun. Channel testified that during this incident, Terrence fled the room, heading toward the kitchen and out the back door of the house. At some point, Tyrone chased after Terrence and left her in the front room of the house. She was then able to open the front door, crawl to a neighbor's house, and get the neighbor to call the police. She testified, "I do not have any doubt in my mind that Tyrone Toles was the one that shot me." *Id.* at 121.

---

[2] In the escape count, the State alleged that on the day of the shootings, Tyrone knowingly removed a GPS tracking device.

[6]     Mike testified that Terrence and Tyrone had fallen asleep and Channel was sitting in the middle of the room mumbling to herself. Mike stated that while he was outside relieving himself on the side of the house and making calls to get a ride home, he heard the screen door at the front of Tyrone's house slam. He returned to the front of the house a minute or two later. Mike testified that once inside, he saw Tyrone wrestling with another man in a hoodie. Mike stated that after a minute or two of wrestling in the front room, Tyrone ran toward the kitchen and the back of the house. Less than a minute later, Mike heard gunshots, prompting him to flee the scene. He testified that lights were on in the house, but he never saw a gun, could not see where Channel or Terrence were during the wrestling incident between Tyrone and the man in the hoodie, and could not identify the man in the hoodie.

[7]     Tyrone testified that he had fallen asleep by the time of the incident. He said that he was woken up by a heavy thump and saw two people wrestling. He stated that upon seeing this, he chose to flee, only reaching the back door of the house when he heard the gunshots coming from the front of his house. He fled out the back door and ran away from the scene. He testified that he came back later that morning and saw ambulances and police on the scene but did not make contact with any of the authorities.

[8]     The jury found Tyrone guilty of attempting to murder Channel but not guilty of attempting to murder Terrence. The trial court imposed an aggregate sentence of thirty-five years in the Department of Correction.

Tyrone now appeals.

# Discussion and Decision

Tyrone contends that the evidence is insufficient to support his attempted-murder conviction. When reviewing sufficiency-of-the-evidence claims, we neither reweigh the evidence nor judge the credibility of witnesses. *Willis v. State*, 27 N.E.3d 1065, 1066 (Ind. 2015). We will only consider the evidence supporting the verdict and any reasonable inferences that can be drawn from the evidence. *Id*. A conviction will be affirmed if there is substantial evidence of probative value to support each element of the offense such that a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt. *Id*.

Tyrone does not dispute that Channel's testimony, if believed, would be sufficient to support his conviction. However, he argues that her testimony was not "reliable." Appellant's Br. pp. 4, 10, 11, 12, 15. But we do not judge witness credibility. *Willis*, 27 N.E.3d at 1066. There is only one exception to this rule: the incredible-dubiosity doctrine, under which we can impinge upon a factfinder's responsibility to judge the credibility of the witnesses when "the testimony is so incredibly dubious or inherently improbable that no reasonable person could believe it." *Hampton v. State*, 921 N.E.2d 27, 29 (Ind. Ct. App. 2010), *trans. denied*. Tyrone does not make an argument under that doctrine. Nonetheless, we will treat his argument as an incredible-dubiosity argument. To

the extent Tyrone wants us to adopt a separate "reliability" or "unreliability" test in addition to the incredible-dubiosity doctrine, we decline to do so.

[12]     According to our Supreme Court, the incredible-dubiosity doctrine "requires that there be: 1) a sole testifying witness; 2) testimony that is inherently contradictory, equivocal, or the result of coercion; and 3) a complete absence of circumstantial evidence." *Moore v .State*, 27 N.E.3d 749, 756 (Ind. 2015). The first element is satisfied—Channel was the sole testifying witness on the issue of identity. However, the second and third elements are not.

[13]     Regarding the second element, Tyrone's and Mike's stories about what happened are different than Channel's, but nothing about her testimony is inherently contradictory, equivocal, or coerced. On the contrary, she was very unequivocal. Channel testified that she did "not have any doubt in [her] mind that Tyrone Toles was the one that shot me." Tr. p. 121. Tyrone argues that Channel's intoxication "certainly impacted her perceptions, her experiences, and her ability to recall." Appellant's Br. p. 15. He also argues that Channel had an "enmity towards him," "did not view him favorably," and "imagined that he did not want her in the house." *Id.* at 15. However, Channel's intoxication and alleged "enmity" do not necessarily render her testimony incredibly dubious. The jury was made well aware of these facts and weighed Channel's testimony.

[14]     Moreover, there is physical evidence corroborating Channel's testimony that Tyrone was the shooter. The spent shell casings found in the living room were

manufactured by Aguila and Winchester. All the rounds fired on the scene were .45 caliber rounds. On the living-room table, the same table that everyone was sitting at, was a shoebox containing more .45 caliber rounds manufactured by Aguila. A Glock carrying case, minus the actual weapon, was found in the kitchen. And a firearms expert testified that the bullet jackets found on the scene were likely fired by a Bersa or Glock handgun.

[15] Tyrone also argues there are inconsistencies in Channel's testimony that are exposed by the physical evidence. He argues that "[Channel] asserted that Tyrone Toles pointed a gun towards or at the ceiling, but the evidence does not support that action," *id.*, because there were no bullet holes in the ceiling of Tyrone's living room. But Channel clarified this point testifying that when she said "in the air," she meant "just pull it out, shoot randomly. We're not gonna aim." Tr. p. 129. Tyrone also argues that Channel "said she was shot while Tyrone Toles was on top of her, but no stippling was observed." Appellant's Br. p. 15. Stippling happens when "somebody gets shot at close range, the gunpowder coming out of the gun is going to burn or put little pock marks in the skin." Tr. p. 160. However, this was explained by the trauma surgeon who worked on Channel. The surgeon noted there was no mention of stippling in the medical record because "that's not something we generally comment on."

[16] Because Channel testified that Tyrone was the shooter, and because that testimony was not incredibly dubious, we affirm Tyrone's conviction for attempted murder.

Affirmed.

Bailey, J., and Baker, Sr.J., concur.