## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jan 25 2018, 10:00 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Andrew L. Teel
Haller & Colvin, P.C.
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Larry Allen
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Ricky L. Williford, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | January 25, 2018 <br><br> Court of Appeals Case No. <br> 17A04-1608-CR-1852 <br><br> Appeal from the DeKalb Superior Court <br><br> The Honorable Kevin P. Wallace, Judge <br><br> Trial Court Cause No. <br> 17D01-1504-F2-1 |

**Pyle, Judge.**

# Statement of the Case

Ricky L. Williford ("Williford") appeals his conviction for Level 2 felony possession of a destructive device or explosive with intent to kill, injure, intimidate, or to destroy property ("possession of a destructive device")[1] and his status as an habitual offender.[2] On appeal, he argues that: (1) the trial court abused its discretion when it denied his motion for a mistrial on his possession of a destructive device conviction because, during the habitual offender phase of his trial, a juror impeached the possession of a destructive device verdict; (2) the trial court erred when it impaneled a new jury to hear the habitual offender phase of his trial after the first jury could not reach a determination; and (3) there was insufficient evidence to support his possession of a destructive device conviction. Because we conclude that the trial court did not abuse its discretion or err and because there was sufficient evidence, we affirm Williford's conviction.

We affirm.

# Issues

1. Whether the trial court abused its discretion when it denied Williford's motion for a mistrial after the first phase of his trial.

2. Whether the trial court erred when it impaneled a new jury to hear the habitual offender phase of Williford's trial.

---

[1] IND. CODE § 35-47.5-5-8.

[2] I.C. § 35-50-2-8.

3.  Whether the State produced sufficient evidence to convict Williford of Level 2 felony possession of a destructive device.

# Facts

[3]     At some point in 2014, Williford began to believe that Joshua Rupert ("Rupert"), whom he had known for "quite a few years," owed him four hundred dollars. (Tr. Vol. 1 at 163). Rupert disputed the debt, so he did not pay Williford the money. As a result, Williford began sending Rupert threatening text messages and making threatening calls, demanding the money.

[4]     One day in late September or early October 2014, Williford came to the garage where Rupert worked on vehicles in Auburn, Indiana and "beat[]" on the door demanding to be let in. (Tr. Vol. 1 at 166). When Rupert answered the door, Williford pushed him backwards, pulled out a gun, and began "ranting and raving" that Rupert owed him money. (Tr. Vol. 1 at 166). He fired a round from the gun and threatened to shoot Rupert's dog if Rupert did not pay him back by the end of the week. Williford then tipped over a display case and ran out the garage door. Later, Williford sent Rupert a text asking if he "had the money yet," and Rupert told him that he did not. (Tr. Vol. 1 at 168).

[5]     On the night of October 13, 2014 and into early morning of October 14, Williford spent time hanging out with his friends Doug Bishop ("Bishop") and Ryan Likens ("Likens"). Around 5:00 a.m. on October 14, Bishop and Williford drove Likens home so that he could go to work. After dropping off Likens, they drove by Rupert's garage and noticed that his light was on.

Williford directed Bishop, who was driving, to "keep going and turn down Indiana South." (Tr. Vol. 1 at 107). Bishop continued to drive down a couple more streets and then parked in a cul-de-sac. At that point, Williford "jumped out and took off," carrying a bag and heading "north towards Rupert's [house]." (Tr. Vol. 1 at 107). Bishop sat in his van "wondering what [was] going on," and a couple of minutes later he heard a "pretty good size[d]" explosion. (Tr. Vol. 1 at 108). After that, Williford came back, running and "out of wind." (Tr. Vol. 1 at 108). He told Bishop to take off, so they drove away from the cul-de-sac.

[6] Williford told Bishop where to drive, and they eventually turned onto Eighth Street in Auburn. There, Williford asked Bishop to pull over. He took off his shoes and discarded them in a trash bin on Eighth Street. Bishop asked him why he had done that, and Williford said that "he just wanted to get rid of them." (Tr. Vol. 1 at 111). Williford then pulled another pair of shoes out of the bag he had taken with him when he had left the van and put those shoes on.

[7] In the meantime, at around 5:45 to 5:50 a.m., an explosion had occurred in Rupert's truck, which was parked outside of his garage. Detective Richard Page ("Detective Page"), a detective and bomb technician with the Fort Wayne Police Department, responded to the scene. In the truck, he discovered a blue cooler with damage indicating that it had contained an explosive device. The lid of the cooler was gone, and its zipper was torn apart. As a result of the explosion, the door and roof of the truck had "buckled outward." (Tr. Vol. 1 at 216). The windshield and rear window of the truck were missing, and there

were "little dents" in the top of the truck and in the seat, which were consistent with damage from BBs or fragments that would have been inside of the device when it exploded. (Tr. Vol. 1 at 217). There were BBs and debris in the truck and on the asphalt next to the truck, and the truck's windshield was found seventy feet to the north.

[8] Based on the evidence at the scene, Detective Page determined that the explosive device had been a "low explosive"— an explosive made from "things you can buy off the shelf" that "detonate at a rate slower than thirty-three hundred feet per second." (Tr. Vol. 1 at 226). He estimated that the device had been made of at least six to ten grams of flash powder, a mix of chemicals used mostly in the pyrotechnics industry.

[9] Investigators interviewed Bishop several times after the explosion and learned about his activities with Williford on the morning of October 14, although Bishop gave differing accounts about their activities. The investigators also found shoes matching the description of Williford's shoes in a trash bin on Eighth Street.

[10] On April 7, 2015, the State charged Williford with Level 2 felony possession of a destructive device and with being an habitual offender.[3] The trial court held a jury trial from May 10-12, 2016. At trial, Bishop testified to his activities with

___

[3] The State also charged Williford with a second count of Class A felony possession of a destructive device based on a separate incident regarding an explosive device. However, because the jury found Williford not guilty of that charge, we have not included the facts or charging information for that incident here.

Williford, as described above, on the morning that Rupert's truck had exploded. On cross-examination, he admitted that this account of events did not match previous accounts he had given to the police. Bishop explained that he had previously "not wanted to say anything at first" because he had been "freaked out" and "trying to protect [himself]" and "everybody else involved." (Tr. Vol. 1 at 125-26).

[11] Also during Bishop's testimony, the State admitted a recording and transcript of a phone call that Williford had made from jail to Bishop. During the call, the following exchange occurred:

> Williford: Hey, did they ahh get ahold of you and harass you a bit?
>
> Bishop: Yeh.
>
> Williford: Yeh. What ja tell them? What'd they say?
>
> Bishop: Aw they were just – I don't know man. They already knew everything.
>
> Williford: Like what?
>
> Bishop: About me and, it was strange.
>
> Williford: About what?
>
> Bishop: About me.
>
> Williford: What do you mean about you?
>
> Bish[op]: They were just – I don't know – they were really strange about what they were saying.
>
> Williford: They were trying to lead you on bro.

Bishop: Yep.

Williford: They were fishing.

Bishop: That's what I figured.

Williford: [T]hey were fishing.

Bishop: Ri-right.

Williford: Hey remember that day in the van? I told – hey – You said, uh – you said "To the grave, beserk?"

Bishop: Right.

Williford: Hey, tha-that's how it is bro. There ain't nothing but you and me.

Bishop: Right.

(State's Ex. 11) (Misspellings and improper grammar in original). Bishop testified that Bezerk had been a best friend of his. He explained that, during the conversation in the van mentioned in the phone call, he had told Williford that "they could take it to the grave like [he] and Bezerk did." (Tr. Vol. 1 at 122). However, he did not clarify what he had told Williford that they could take to the grave.

[12] Cari Ann Day ("Day"), a woman who lived on Seventh Street in Auburn, also testified. She said that the back of her house was on Eighth Street and that, on October 14, 2014, she had seen a suspicious van drive "really slow[ly]" up Eighth Street sometime between 6:00 and 8:00 a.m. (Tr. Vol. 1 at 155). The van had stopped at the trash bins on the street, and the passenger had thrown a pair of shoes into the trash. Day testified that she had reported the incident

because, when she told her mother about it, her mother had told her it might be connected to the truck explosion. When Williford asked Day on cross-examination whether she could narrow down the time frame for when she saw the van, she responded that her mother had been at work when she called her, so it must have been after 7:00 a.m. However, Day did not clarify how much time had elapsed after seeing the van before she had called her mom.

[13] At the conclusion of the trial, the jury found Williford guilty of Level 2 felony possession of a destructive device. The trial court asked whether the State or Defense "wish[ed] to have the Jurors individually polled regarding the verdict," and Williford's counsel responded "No your Honor." (Tr. Vol. 2 at 85).

[14] After the jury returned its verdict, the trial court proceeded to the second phase of the trial regarding Williford's habitual offender allegation. During the jury deliberations on the habitual offender charge, the trial court received a note from a juror that said "I am feeling sicker and sicker. I cannot [] give him the Habitual Offender vote[,] so I need you to excuse me and use one of the alternates." (Tr. Vol. 2 at 94). The trial court questioned the juror outside of the presence of the rest of the jury, and she said that her blood pressure was "going higher" because she did not "like being the only one who d[id not] agree with everybody else." (Tr. Vol. 2 at 98). She further explained that she had gone along with the other jurors in finding Williford guilty of possession of a destructive device but could not "put him in the Habitual Offender class" because she did not "believe he was that bad." (Tr. Vol. 2 at 98, 99). She said she had had "some reasonable doubts" as to his guilt of the possession of a

destructive device but had concluded, after hearing Williford's "intimidation" in the jail phone call, that Williford "could be guilty of all the rest of it." (Tr. Vol. 2 at 99, 101).

[15] After the trial court talked to the juror, Williford moved for a mistrial on the grounds that the juror had been coerced into agreeing to a guilty verdict on the underlying offense. The trial court denied the motion for a mistrial as to phase one, but it found that there was a mistrial as a result of a hung jury with respect to the habitual offender phase.

[16] Thereafter, on June 28, 2016, the trial court convened a second jury to hear the evidence regarding the habitual offender charge. During this second phase of the trial, the State introduced Williford's judgment of conviction for his 2002 Class B felony dealing in cocaine or a narcotic drug conviction and the sentencing order for his 2007 Class C felony attempted robbery conviction. Detective John Phillip Snover of the Auburn Police Department also testified that Williford had been convicted of Level 2 felony possession of a destructive device in the instant cause on May 12, 2016. At the conclusion of the presentation of evidence, the jury found Williford to be an habitual offender.

[17] The trial court sentenced Williford to an executed term of twenty-five (25) years for his possession of a destructive device conviction. This sentence was enhanced by an additional ten (10) years for his habitual offender finding. The trial court also ordered Williford to serve this sentence consecutively to any

previously imposed sentences, for an aggregate sentence of thirty-five (35) years. Williford now appeals.

# Decision

On appeal, Williford argues that: (1) the trial court abused its discretion when it denied his motion for a mistrial; (2) the trial court erred when it impaneled a second jury to try his habitual offender allegation; and (3) there was insufficient evidence to prove that he possessed a destructive device. We will address each of these arguments in turn.

## 1. Motion for Mistrial

As stated above, Williford moved for a mistrial during the second phase of his trial after a juror came forward and said that she had had "some reasonable doubts" as to his guilt of possession of a destructive device. (Tr. Vol. 2 at 99). He argued that the juror had impeached the jury's verdict and that, accordingly, the trial court should have declared a mistrial as to the first phase of the trial. Because the trial court denied his motion, Williford now argues that the trial court abused its discretion.

First, we note that "'a mistrial is an extreme remedy that is only justified when other remedial measures are insufficient to rectify the situation.'" *Isom v. State*, 31 N.E.3d 469, 481 (Ind. 2015) (quoting *Mickens v. State*, 742 N.E.2d 927, 929 (Ind. 2001)), *reh'g denied*, *cert. denied*. Whether to grant or deny a motion for a mistrial lies within the sound discretion of the trial court, and we will review the trial court's decision for an abuse of discretion. *Id.* at 480. "'We accord great

deference to the trial court's decision, as it is in the best position to gauge the circumstances and the probable impact on the jury.'" *Phillips v. State*, 22 N.E.3d 749, 757-68 (Ind. Ct. App. 2014) (quoting *Evans v. State*, 855 N.E.2d 378, 386 (Ind. Ct. App. 2006) (internal quote omitted)), *trans. denied.* In determining whether a mistrial is warranted, the relevant inquiry is whether the defendant was placed in a position of grave peril to which he should not have been subjected; the gravity of the peril is determined by the probable persuasive effect on the jury's decision. *Id.* at 758.

[21] It is a well-established rule in Indiana that a jury's verdict may not be impeached by jurors who subsequently submit a contradictory affidavit or testimony. *See Shaw v. State*, 82 N.E.3d 886 (Ind. Ct. App. 2017). Our Indiana Supreme Court has explained the policy concerns behind this rule as follows:

> If this Court were to permit individual jurors to make affidavits or give testimony disclosing the manner of deliberation in the jury room and their version of the reasons for rendering a particular verdict, there would be no reasonable end to litigation. Jurors would be harassed by both sides of litigation and find themselves in a contest of affidavits and counter-affidavits and arguments and rearguments as to why and how a certain verdict was reached. Such an unsettled state of affairs would be a disservice to the parties litigant and an unconscionable burden upon citizens who serve on juries.

*Stinson v. State*, 313 N.E.2d 699, 704 (Ind. 1974).

[22] While Williford recognizes this precedent, he argues that the instant case is different because the juror in this case volunteered information impeaching her

verdict while the jury was still impaneled. He claims that "[p]ermitting a juror to change her mind while still empaneled [sic] is not meaningfully different from permitting a juror to change her mind during polling." (Williford's Br. 27). We disagree.

[23] In *Ward v. St. Mary Medical Ctr. of Gary*, 658 N.E.2d 893, 895 (Ind. 1995), our supreme court held that a jury's verdict may not be impeached by the testimony of a juror, even when the testimony is voluntary and the jury is still impaneled. Williford asserts that this precedent does not apply because *Ward* was a civil case rather than a criminal case. However, in support of its determination that testimony while the jury is still impaneled may not impeach the verdict, the *Ward* Court cited *Karlos v. State*, 476 N.E.2d 819, 824 (Ind. 1985), a criminal case. *Id.* As a result, whether the case is criminal or civil, the general rule remains the same: a jury's verdict cannot be impeached by the voluntary testimony of a juror, even when the jury is still impaneled. To create even a limited exception "would perpetuate unending litigation 'where no jury verdict would ever be lasting or conclusive.'" *Ward*, 658 N.E.2d at 895 (internal quotation omitted). Accordingly, we decline to deviate from *Ward* based on the criminal context of the jury's verdict.

[24] Further, "permitting a juror to change her mind while still impaneled" here would not be, as Williford argues, equivalent to "permitting a juror to change her mind during polling." (Williford's Br. 27). The object of polling the jury is to "give the parties an opportunity to ascertain with certainty that a unanimous verdict has been reached before the verdict is recorded and the jury discharged."

*Jelks v. State*, 720 N.E.2d 1171, 1173 (Ind. Ct. App. 1999). If, during polling, any juror dissents from the verdict, the remedy is that "the jury shall be sent out to deliberate" again. I.C. § 34-36-1-9. *See Jelks*, 720 N.E.2d at 1173, 1174 (noting that INDIANA CODE § 34-36-1-9 applies to criminal cases through INDIANA CODE § 35-35-2-2 and that "[t]he statute clearly provides that the remedy for juror dissent that arises during the polling procedure is to return the jury for deliberations . . .").

[25] Here, Williford rejected the opportunity to poll the jury, so the trial court moved on to the second phase of the trial. We have previously noted that "[o]ne of the purposes of bifurcation is to keep convictions away from the jury in their initial determination of guilt for the substantive crime charged." *Russell v. State*, 997 N.E.2d 351, 354 (Ind. 2013). Accordingly, during the habitual offender phase of the trial, the jury members learned additional information about Williford's past convictions that they did not know during their deliberation of his possession of a destructive device charge. Therefore, they could no longer be sent back to deliberate on the possession of a destructive device charge based on the same evidence that they had originally considered.

[26] In light of these factors, we conclude that the juror could not later impeach the jury's verdict, even though the jury was still impaneled. Thus, the trial court did not abuse its discretion when it denied Williford's motion for a mistrial.

**2. Habitual Offender Adjudication**

[27] Williford next argues that the trial court erred when it impaneled a second jury to try the habitual offender charge after the second phase of the first trial ended in a mistrial due to a hung jury. He asks us to interpret the relevant statutory provision, INDIANA CODE § 35-50-2-8(h), as requiring the same jury who heard the underlying offense phase of a trial to also hear the habitual offender phase. However, this argument directly contradicts our supreme court's holding that INDIANA CODE § 35-50-2-8(h) permits the retrial by a second jury on a habitual offender charge when the first jury cannot reach a verdict. *See Stewart v. State*, 688 N.E.2d 1254, 1258 (Ind. 1997). We decline Williford's request to re-evaluate this precedent.

### 3. Sufficiency of the Evidence

[28] Finally, Williford argues that there was insufficient evidence to support his conviction for possession of a destructive device. Our standard of review for sufficiency of the evidence claims is well-settled. We consider only the probative evidence and reasonable inferences supporting the verdict. *Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007). We do not reweigh the evidence or judge witness credibility. *Id.* We will affirm the conviction unless no reasonable fact finder could find the elements of the crime proven beyond a reasonable doubt. *Id.* The evidence is sufficient if an inference may be reasonably drawn from it to support the verdict. *Id.* at 147.

[29] In order to convict Williford of possession of a destructive device, the State had to prove beyond a reasonable doubt that he: "possesse[d]" a "destructive device

or explosive with the knowledge or intent that it [would] be used to kill, injure, or intimidate an individual or to destroy property." I.C. § 35-47.5-5-8.

[30] Williford claims that there was insufficient evidence to support his conviction because his conviction was based on Bishop's testimony at trial, which was, according to Williford, incredibly dubious. In general, the uncorroborated testimony of one victim is sufficient to sustain a conviction. *Holeton v. State*, 853 N.E.2d 539, 541 (Ind. Ct. App. 2006). However, the incredible dubiosity rule allows the appellate court to impinge upon the fact-finder's assessment of witness credibility when the testimony at trial was "so contradictory that the verdict reached would be inherently improbable." *Moore v. State*, 27 N.E.3d 749, 751 (Ind. 2015). "For the incredible dubiosity rule to apply, the evidence presented must be so unbelievable, incredible, or improbable that no reasonable person could ever reach a guilty verdict based upon that evidence alone." *Id*. A court will impinge upon the jury's duty to judge witness credibility only "'where a *sole witness* presents inherently contradictory testimony which is equivocal or the result of coercion and there is a *complete lack of circumstantial evidence* of the appellant's guilt.'" *Id.* (quoting *Tillman v. State*, 642 N.E.2d 221, 223 (Ind. 1994)) (emphasis added in *Moore*).

[31] We conclude that the incredible dubiosity rule does not apply here because Bishop was not the sole witness, and there was circumstantial evidence of Williford's guilt. In addition to Bishop's testimony, Rupert testified that Williford had previously threatened him in his garage, and there was evidence of a jail phone call in which Williford told Bishop to take it "[t]o the grave,

beserk." (State's Ex. 11). Day also corroborated Bishop's testimony that Williford had dumped his shoes in the garbage can on Eighth Street after the explosion, and shoes matching the description of Williford's shoes were found in the garbage bin.[4]

[32] Based on these additional witnesses and evidence supporting Williford's guilt, we conclude that the incredible dubiosity rule does not apply. As Williford does not otherwise challenge the sufficiency of the evidence, we find that there was sufficient evidence to support Williford's conviction.

[33] Affirmed.

May, J., and Brown, J., concur.

---

[4] Williford claims that Day's testimony did not corroborate Bishop's testimony because too much time passed between the time when the explosion happened and the time when Day said Williford abandoned the shoes. However, Williford bases this argument on Day's testimony that she called her mother to tell her about the van and that her mother was at work, which would have been after 7:00 a.m. This argument fails to account for the fact that Day did not clarify during her testimony how much time had passed after she saw the van on Eighth Street before she called her mother. Moreover, she testified that she saw the van between 6:00 and 8:00 a.m., which was consistent with the timeline to which Bishop testified. Accordingly, we conclude that Day's testimony did corroborate Bishop's testimony.