## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 26 2018, 9:44 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Bruce W. Graham
Graham Law Firm P.C.
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Tyler G. Banks
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Michael Allen Shoaf,
*Appellant-Defendant,*

v.

State of Indiana,
*Appellee-Plaintiff*

March 26, 2018

Court of Appeals Case No.
79A02-1707-CR-1728

Appeal from the Tippecanoe
Circuit Court

The Honorable Thomas H. Busch,
Judge

Trial Court Cause No.
79C01-1608-F1-12

**Najam, Judge.**

## Statement of the Case

Michael Allen Shoaf appeals his two convictions for child molesting, as Level 1 felonies, following a jury trial. He raises two issues for our review, which we restate as follows:

1. Whether the trial court committed fundamental error when it determined that K.P. was competent to testify at trial.

2. Whether application of the incredible dubiosity rule establishes that there is insufficient evidence to support his convictions.

We affirm.

## Facts and Procedural History

K.P. is the daughter of C.P. ("Father") and S.H. ("Mother"). Father and Mother are no longer married, and Father got remarried to D.P. ("Stepmother). Father and Mother shared custody of K.P. On occasion, Father, Stepmother, K.P., and K.P.'s siblings would stay at the home of Shoaf, Father's stepfather, and Leann, Father's mother. During their stays, Father and Stepmother would sleep in a basement apartment. The children would sleep in bedrooms on the main floor of the house, which is also where Shoaf's bedroom is located.

The family stayed at Shoaf's residence for a few nights near the end of July 2016, when K.P. was five years old. One night, Stepmother woke up and thought that she heard the children making noise upstairs, so she asked Father

to go upstairs to check on the them. Once he was upstairs, Father went through Shoaf's open bedroom door and saw Shoaf on top of K.P. Father got very angry and yelled for Shoaf to "[g]et off [K.P.]" Tr. Vol. II at 46. Father then went back downstairs, and Stepmother noticed that he was very angry. Father and Stepmother then went back upstairs, and Stepmother saw K.P. at the top of the stairs crying. Stepmother took K.P. out of the house, and they went to sit in their car. Sometime after they sat down in their car, K.P. and Stepmother saw Shoaf leave the house and get in his vehicle. When K.P. saw Shoaf outside of the house, she "flipped out and latched on to" Stepmother, and she "grabbed" and "hugged" Stepmother because she was scared. Tr. Vol. II at 104.

[5] The weekend after the incident occurred, K.P. returned to Mother's house. While K.P. was playing outside one day, Mother saw K.P. "pulling her pants down and pulling her shirt up to her brothers and sisters." *Id*. at 89. Mother then asked K.P. if she had ever shown anyone her private areas or if anyone had touched her. K.P. told Mother that Shoaf had touched her. Mother made an appointment with K.P.'s pediatrician for the following Monday. A report was filed with Child Protective Services and the authorities were notified. Shortly after the appointment with the pediatrician, Mother took K.P. to the Indiana University Riley Pediatric Center of Hope ("PCOH") for a medical evaluation based on the alleged sexual abuse.

[6] At PCOH, Dr. Ralph Hicks examined K.P. Also present were several nurses, a social worker, a family case manager, and Detective Thad Miller with the Tippecanoe County Sherriff's Department. During that appointment, K.P.

stated that Shoaf had "touched her privates." Ex. at 7. On August 2, 2016, Investigator Dawn Gross with the Tippecanoe County Sheriff's Department conducted a forensic interview of K.P. During the interview, K.P. stated that while Leann was asleep in the same room, Shoaf "put his weenie in her parts and wiggled. He put his weenie in my mouth and wiggled. Snot came out of his weenie into my mouth, which tasted gross[.]" *Id.* at 8. She also stated that it happened on more than one occasion. Investigator Gross also interviewed Stepmother and Father. Subsequently, Officer Gross obtained a search warrant for Shoaf's house. When officers arrived at Shoaf's house to execute the search warrant, officers arrested Shoaf and transported him to the Sheriff's Department.

[7] On August 9, the State charged Shoaf with two counts of child molesting, as Level 1 felonies. The trial court held a jury trial on May 9 and 10, 2017.[1] During the jury trial, K.P., who was then six years old, testified. After the State called K.P. as a witness, the trial court asked her if she promised to "tell the truth and only the truth and all of the truth[.]" Tr. Vol. II at 33. K.P. responded, "[u]h huh." *Id.* When the State began to question K.P., the State asked her to clarify her response to the oath, to which K.P. responded, "Yes." *Id.* at 34. The State then asked K.P. what it means to tell the truth. In response, K.P. stated that it "means you don't get in trouble." *Id.* Similarly, when the State asked what happens if someone does not tell the truth, K.P.

---

[1] Father died on December 25, 2016, prior to Shoaf's jury trial.

stated that "[y]ou get in trouble." *Id*. Shoaf did not object to K.P.'s testimony on the grounds that she did not understand the oath.

[8] During her testimony, K.P. testified that Shoaf put her on the floor of his bedroom while Leann was asleep in the bed and that he placed his "boy part"[2] in her mouth one time. *Id*. at 39. She further testified that "snot" came out of his "boy part," that it tasted "bad" when it "went into [her] mouth," and that she then spit it out. *Id*. at 41. She also testified that Shoaf put his "boy part" in between her legs where she "[g]o[es] potty," which she said hurt her. *Id*. at 43. K.P. also testified that, at one point, Father came into the room, got really angry, and said, "[g]et off of [K.P.]." *Id*. at 46. At the end of K.P.'s testimony, the State asked her if anybody had told her what to say while she testified. K.P. indicated that her Mother and stepfather had told her "[t]o tell the truth." *Id*. at 53.

[9] The jury found Shoaf guilty of both counts of child molestation, as Level 1 felonies, and the trial court entered judgment of conviction accordingly. The trial court sentenced Shoaf to concurrent terms of twenty-four and one-half years to be fully executed in the Department of Correction. This appeal ensued.

---

[2] The State used an anatomically correct drawing of a boy and asked K.P. to identify the body parts. K.P. referred to a penis as a "boy part."

# Discussion and Decision

### *Issue One: K.P.'s Competency to Testify*

Shoaf first asserts that the trial court erred when it permitted K.P. to testify without evidence that K.P. was a competent witness. A child is competent to testify at trial if it can be established that the child: "(1) understands the difference between telling a lie and telling the truth, (2) knows she is under a compulsion to tell the truth, and (3) knows what a true statement actually is." *Saylor v. State*, 55 N.E.3d 354, 361 (Ind. Ct. App. 2016). The trial court has discretion to determine whether a child witness is competent based on the trial court's observation of the child's demeanor and responses to questions posed by counsel and the court. *Id.*

Shoaf acknowledges that he did not object to K.P.'s competency at trial. Thus, to prevail on appeal, he must establish that the trial court committed fundamental error when it permitted K.P. to testify. To prove fundamental error, Shoaf must "'show that the trial court should have raised the issue *sua sponte* due to a blatant violation of basic and elementary principles, undeniable harm or potential for harm, and prejudice that makes a fair trial impossible.'" *Taylor v. State*, 86 N.E.3d 157, 162 (Ind. 2017) (quoting *Harris v. State*, 76 N.E.3d 137, 140 (Ind. 2017)). "A 'finding of fundamental error essentially means that the trial judge erred . . . by not acting when he or she should have,' even without being spurred to action by a timely objection." *Brewington v. State*, 7 N.E.3d 946, 974 (Ind. 2014) (quoting *Whiting v. State*, 969 N.E.2d 24, 34 (Ind. 2012)) (omission original to *Brewington*).

We cannot say that the trial court committed fundamental error when it permitted K.P. to testify. K.P. twice responded affirmatively when she was asked to tell the truth. K.P. then stated that to tell the truth "means you don't get in trouble" and that, if you do not tell the truth, "[y]ou get in trouble." *Id.* at 34. And K.P. indicated that no one told her what to say other than her mother and step-father telling her "[t]o tell the truth." *Id.* at 53.

Further, K.P.'s "responses to questions posed" demonstrated a knowledge that most children her age do not have. *Saylor*, 55 N.E.3d at 361. And there is no reason in the record for this court to doubt the trial court's ability to observe K.P.'s demeanor during her testimony. The record supports the conclusion that K.P. was a competent witness. Thus, we cannot say that the trial court erred when it did not act without being prompted by a timely objection. *See Brewington*, 7 N.E.3d at 974.[3] There is no fundamental error here.

### Issue Two: Incredible Dubiosity Rule

Shoaf next contends that there is insufficient evidence to support his convictions for child molesting, as Level 1 felonies. Shoaf claims that there was insufficient evidence to support his convictions because his convictions were only based on K.P.'s testimony at trial, which he claims was incredibly dubious. Specifically, he asserts that "[i]t is certainly inherently improbable that Shoaf would have

---

[3] Shoaf cites no authority that would require us to find that the trial court committed fundamental error when it did not *sua sponte* declare K.P. to be an incompetent witness based on the testimony she gave that indicates she was competent.

sexual intercourse with his six-year-old granddaughter—while his wife was asleep in the same room." Appellant's Br. at 19-20.

[15] Under the incredible dubiosity rule, "a court will impinge on the jury's responsibility to judge the credibility of witnesses only when it has confronted 'inherently improbable' testimony or coerced, equivocal, wholly uncorroborated testimony of 'incredible dubiosity.'" *Moore v. State*, 27 N.E.3d 749, 755 (Ind. 2015) (quoting *Tillman v. State*, 642 N.E.2d 221, 223 (Ind. 1994)). For the incredible dubiosity rule to apply, "the evidence presented must be so unbelievable, or improbable that no reasonable person could ever reach a guilty verdict based upon that evidence alone." *Wolf v. State*, 76 N.E.3d 911, 916 (Ind. Ct. App. 2017). "Application of the incredible dubiosity rule is limited to cases with very specific circumstances because we are extremely hesitant to invade the province of the jury." *Smith v. State*, 34 N.E.3d 1211, 1221 (Ind. 2015). For the incredible dubiosity rule to apply, there must be: "(1) a sole testifying witness; 2) testimony that is inherently contradictory, equivocal, or the result of coercion, and 3) a complete absence of circumstantial evidence." *Moore*, 27 N.E.3d at 756.

[16] The incredible dubiosity rule does not apply here because K.P. was not a sole testifying witness. Rather, Stepmother also testified and partially corroborrated K.P.'s testimony. Thus, Shoaf's argument must fail. However, we also briefly note that K.P.'s testimony was not inherently contradictory. The inherent probability prong of the second factor is only satisfied "when the witness's trial testimony was inconsistent within itself, not that it was inconsistent with other

evidence or prior testimony." *Id*. K.P.'s testimony varied only slightly from the statements she gave during her medical consultation at the Center of Hope. There was no material difference in her trial testimony. K.P. consistently testified that Shoaf placed his "boy part" in her mouth; that "snot" came out of his "boy part," which tasted bad; and that she spit it out. Tr. Vol. II at 40. She also consistently testified that Shoaf placed his penis between her legs where she "go[es] potty" and that it hurt. *Id*. at 43. Shoaf's arguments to the contrary merely seek to have this court reassess the weight and credibility of the evidence, which we will not do. We affirm his convictions.

[17] Affirmed.

Mathias, J., and Barnes, J., concur.