## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 18 2018, 10:06 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Stanley L. Campbell
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Lyubov Gore
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Troy A. Shultz,
*Appellant-Defendant,*

v.

State of Indiana,
*Appellee-Plaintiff.*

April 18, 2018

Court of Appeals Case No.
02A03-1711-CR-2737

Appeal from the Allen Superior Court

The Honorable Wendy W. Davis, Judge

Trial Court Cause No.
02D04-1703-F6-251

**Bradford, Judge.**

# Case Summary

[1] Troy Shultz was charged with and found guilty of Level 6 felony criminal confinement after he pinned a battery victim to the ground while her attacker fled the scene. After the end of trial but prior to sentencing, Shultz filed a motion for a mistrial alleging that he was prejudiced by comments he and two friends inadvertently made within earshot of a member of the jury during a break in trial. Following a hearing, the trial court denied Shultz's motion and sentenced him to a term of one and one-half years in community corrections. On appeal, Shultz challenges the sufficiency of the evidence to sustain his conviction and the trial court's denial of his motion for a mistrial. We affirm.

# Facts and Procedural History

[2] In the years leading up to the date in question, Kristine Parker and David Boger were engaged in "[a]n ugly rollercoaster ride" of a relationship. Tr. Vol. II, p. 64. As of December of 2016, Boger and Parker were no longer romantically involved. However, Boger owed Parker money for a debt that was incurred during his relationship with Parker.

[3] At some point during the morning of December 4, 2016, Parker picked up Boger who was going to "work off some of the money he owed" Parker by helping her "with her painting business." Tr. Vol. II, p. 65. Boger had also indicated that he "had a check, but [that] he had to go pick up the check from

one boss, and he had a second check that was at [Shultz's] house[1]" and that he would give Parker these checks to help pay off his debt. Tr. Vol. II, p. 65. Parker and Boger met Boger's boss at Four D's Bar and Grill. After leaving the bar, Parker and Boger made their way to Shultz's home to retrieve the other check.

[4] When they arrived at Shultz's home, Shultz was in the garage. Boger joined Shultz in the garage. After a while, Parker felt that "it was taking way to[o] long to get a check" and became frustrated because she "was under contract for [a] painting gig … and [she] need[ed] to get painting." Tr. Vol. II, p. 68. Parker told Boger "come on, let's go, grab the check, let's go." Tr. Vol. II, p. 68.

[5] Eventually, Parker got out of her vehicle and went into the garage. Parker decided to leave and to complete the painting job alone after Boger became agitated. As Parker started to leave the garage, Boger "got really upset, and tried taking [Parker's] keys away from [her]." Tr. Vol. II, p. 69. Boger "didn't want [her] to leave" so he followed her back to her vehicle. Tr. Vol. II, p. 69. The situation soon escalated. Boger "took [Parker's] keys out of [her] hand, and then he hit [her] in [her] face with it, punched [her] a few times, and knocked [her] to the ground, wrestled [her] over the car and put a dent in [her] vehicle]." Tr. Vol. II, p. 70. "Then some neighbors from across the way …

---

[1] The check was at Shultz's residence because Boger was living with Shultz at the time. Tr. Vol. II, p. 64.

come out, and … asked if the police need to be called, and [Parker] said yes yes call the cops[.]" Tr. Vol. II, p. 70. At this point, Boger took Parker's purse and keys and began "dragging" her into Shultz's garage by the arm. Tr. Vol. II, p. 70. Once in the garage, Boger held Parker down to the ground in between a couch and a table. Parker was "squished down" with Boger "on top of [her]." Tr. Vol. II, p. 73. After a "little bit," Boger told Shultz "to hold [Parker] down, don't let [her] go anywhere[.]" Tr. Vol. II, p. 71. Boger and Shultz switched places and Shultz "starting holding [Parker] down." Tr. Vol. II, p. 74. Boger fled the garage and "took off" in Parker's vehicle. Tr. Vol. II, p. 71. After a while, Shultz "just got up" and let Parker leave. Tr. Vol. II, p. 76. Parker ran through Shultz's home and out a back door before fleeing to a nearby home.

[6] Terrie Kitchen and her fiancé Darrel McDonald lived near Shultz's home. While Kitchen and McDonald were making dinner, they heard a "bang bang bang on the back door." Tr. Vol. II, p. 108. When they answered the door, "here stood this bloody woman shaking, trembling, crying. You could see she had been physically beaten. There was blood coming from her nose. There was blood on her clothes[.]" Tr. Vol. II, p. 108. The woman, *i.e.*, Parker, also "[l]ooked like she had red marks on her neck. Her arm[] had marks on it, and she was complaining about a broken finger[.]" Tr. Vol. II, p. 114. Parker was "distraught" and "a little bit dazed but still knew what was going on." Tr. Vol. II, p. 109. She indicated that while at Shultz's house, she had been beaten by an ex-boyfriend and that Shultz had "held her" before she managed to get away. Tr. Vol. II, p. 115.

[7] Soon thereafter, the police came to the residence to talk to Parker. After talking to Parker, the responding officers documented her injuries. As a result of the incident, Parker suffered "scratches and nicks" all over, nine stiches on the inside of her mouth, eleven stiches on the outside of her lip, and two black eyes. Tr. Vol. II, p. 71.

[8] On March 8, 2017, the State charged Shultz with Level 6 felony criminal confinement. The matter proceeded to trial on September 19, 2017. During a break in trial proceedings, Shultz and two friends loudly discussed the case in the corridor of the courthouse. The conversation ended after Shultz realized that a gentleman walking a few feet in front of them was a juror. Following trial, the jury found Shultz guilty as charged.

[9] Sentencing was originally scheduled for October 17, 2017, but was rescheduled for November 6, 2017. On October 31, 2017, Shultz filed a motion for a mistrial, arguing that the jury may have been tainted by the juror overhearing the conversation between Shultz and his friends during a break in the trial. Following a hearing on Shultz's motion, the trial court denied Shultz's request for a mistrial. The trial court then sentenced Shultz to a term of one and one-half years in community corrections.

# Discussion and Decision

## I. Sufficiency of the Evidence

[10] Shultz contends that the evidence is insufficient to sustain his conviction.

> When reviewing the sufficiency of the evidence to support a conviction, appellate courts must consider only the probative evidence and reasonable inferences *supporting* the verdict. Reviewing courts should not assess witness credibility and weigh the evidence to determine whether it is sufficient to support a conviction. Convictions should be affirmed unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt.

*Moore v. State*, 27 N.E.3d 749, 754 (Ind. 2015) (quotations omitted, emphasis in original). "It is for the trier of fact to resolve conflicts in the evidence and to decide which witnesses to believe or disbelieve." *Murray v. State*, 761 N.E.2d 406, 409 (Ind. 2002) (quotation omitted).

[11] Shultz relies on the incredible dubiosity rule in an attempt to discredit Parker's testimony. The Indiana Supreme Court has defined the limited scope of the incredible dubiosity rule, stating that "a court will impinge on the jury's responsibility to judge the credibility of the witnesses only when it has confronted inherently improbable testimony or coerced, equivocal, wholly uncorroborated testimony of incredible dubiosity." *Moore*, 27 N.E.3d at 755 (internal quotations omitted). Further, "[a] court will only impinge upon the jury's duty to judge witness credibility where a *sole witness* presents inherently contradictory testimony which is equivocal or the result of coercion and there is a *complete lack of circumstantial evidence* of the appellant's guilt. *Id*. (internal quotations omitted, emphases in original). While the incredible dubiosity rule does not provide an impossible standard to meet, "it is a difficult standard to meet, and one that requires great ambiguity and inconsistency in the evidence."

*Id.* at 756 (internal quotations and brackets omitted). Stated differently, "[t]he testimony must be so convoluted and/or contrary to human experience that no reasonable person could believe it." *Id.* (internal quotation omitted).

[12] Shultz argues that, with regard to his confinement of Parker, Parker was the sole testifying witness. However, two of Shultz's neighbors gave corroborating testimony. While the neighbors were not present in Shultz's garage when the attack occurred, they testified about their encounter with Parker immediately following the attack. In doing so, they described Parker's demeanor and injuries. Their testimony regarding what Parker told them immediately after the attack corroborated Parker's trial testimony. Thus, the "first factor of the incredible dubiosity rule has not been met because there were multiple testifying witnesses that the jury could have relied upon in reaching its verdict." *See id.* at 757–58.

[13] In addition, Parker's trial testimony was unwavering and completely consistent. Parker consistently testified that after Boger beat her, Shultz held her down while Boger fled in her vehicle. In an attempt to paint Parker's testimony as inconsistent, Shultz points to alleged inconsistencies between Parker's pre-trial statements to investigating officers and her trial testimony regarding when the garage door was closed and whether she entered the home prior to the attack in the garage. To the extent that Parker's pre-trial statements were inconsistent with her trial testimony, the Indiana Supreme Court has concluded that "even if the trial testimony is inconsistent with pre-trial statements, that does not necessarily make the testimony at trial incredibly dubious." *Id.* at 758. Parker

did not waiver in her testimony at trial and, in performing its role as the trier-of-fact, the jury had the ability to consider Parker's credibility, resolve conflicts in the evidence, and to decide whether it believed Parker.[2] *See Murray*, 761 N.E.2d at 409.

[14] Finally, we disagree with Shultz's claim that evidence of the injuries sustained by Parker could not be considered circumstantial evidence of his guilt. The evidence of the injuries sustained by Parker corroborated her testimony about the attack and could reasonably lead to the inference that both the physical beating and the subsequent confinement occurred in the manner described by Parker. "[W]here there is circumstantial evidence of an individual's guilt, reliance on the incredible dubiosity rule is misplaced." *Moore*, 27 N.E.3d at 759 (internal quotation omitted). Given that none of the factors for application of the incredible dubiosity rule were satisfied, we conclude that under the present circumstances, it would be inappropriate for this court to "impinge on the jury's responsibility to judge the credibility of the witnesses." *Id*. at 760 (internal quotation omitted).

## II. Denial of Request for Mistrial

[15] Shultz also contends that the trial court erred in denying his request for a mistrial. "Mistrial is an extreme remedy invoked only when no other measure

---

[2] This same logic is easily applied to the alleged inconsistencies between Parker's testimony and Boger's testimony. The jury was in the best position to consider the conflicts between the testimony and decide who it believed. *See Murray*, 761 N.E.2d at 409.

can rectify the perilous situation." *Warren v. State*, 757 N.E.2d 995, 998–99 (Ind. 2001) (internal quotation omitted). "Whether to grant or deny a motion for a mistrial lies within the sound discretion of the trial court." *Isom v. State*, 31 N.E.3d 469, 480 (Ind. 2015). "On appeal, the trial judge's discretion in determining whether to grant a mistrial is afforded great deference because the judge is in the best position to gauge the surrounding circumstances of an event and its impact on the jury." *McManus v. State*, 814 N.E.2d 253, 260 (Ind. 2004). "We therefore review the trial court's decision solely for abuse of discretion." *Id.*

[16] In this case, the alleged harm took place during a break in trial. The trial court excused the parties and jurors for lunch after voir dire and opening statements were completed and before the presentation of the evidence began. Shultz and two friends loudly discussed the case in the corridor of the courthouse as they left for lunch. This conversation included disparaging remarks about Parker and the Fort Wayne police department. The conversation ended after Shultz realized that a gentleman walking a few feet in front of them was a juror. When Shultz pointed the juror out to his friends, the juror nodded his head.

[17] It is undisputed that Shultz did not alert the trial court of the situation at any time between when the trial resumed and the end of jury deliberations. In fact, Shultz did not complain of the alleged misconduct until approximately a month after he was convicted. We agree with the State that the record reflects that Shultz had ample opportunity to alert the trial court of the situation.

[18] Shultz had the duty and responsibility to alert the trial court of the alleged misconduct after he realized that a juror may have overheard his conversation with his friends. Shultz, however, did not report the alleged misconduct to the trial court. We conclude that Shultz relinquished the claim of error when the he failed to formally raise the issue with the trial court in a timely manner. *See Whiting v. State*, 516 N.E.2d 1067, 1067 (Ind. 1987) (providing that a defendant may not observe an error in the trial, make no objection, and yet claim such error as a reason for reversal).

[19] In addition, "[a] defendant who creates his own cause for mistrial presents no error." *Avant v. State*, 528 N.E.2d 74, 78 (Ind. 1988). In this case, the alleged harm was caused by Shultz and his friends. Their conduct, *i.e.*, making disparaging comments about the State's witness and local law enforcement in the presence of a member of the jury, cannot create cause for mistrial. For these reasons, we conclude that the trial court did not abuse its discretion in this regard.

[20] The judgment of the trial court is affirmed.

Baker, J., and Kirsch, J., concur.