## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Apr 07 2020, 9:23 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

R. Patrick Magrath
Alcorn Sage Schwartz & Magrath, LLP
Madison, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert L. Yates
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Cody Lee Bellamy,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

April 7, 2020

Court of Appeals Case No.
19A-CR-2654

Appeal from the Ripley Superior Court

The Honorable Jeffrey Sharp, Judge

Trial Court Cause No.
69D01-1809-F6-215

**Crone, Judge.**

# Case Summary

[1] A trial court convicted Cody Lee Bellamy of level 6 felony strangulation and class B misdemeanor battery. He now appeals his strangulation conviction, claiming that the victim's testimony was incredibly dubious. He also challenges his two-year executed sentence, claiming that it is inappropriate in light of the nature of his offenses and his character. We affirm.

# Facts and Procedural History

[2] In May 2018, Bellamy began a romantic relationship with J.M., whom he had met at work. At that time, Bellamy was on probation for a 2016 burglary conviction. By mid-summer, he had moved into J.M.'s efficiency apartment. He lost his job when he was pulled over and arrested for driving on a suspended license, and J.M. resigned her position shortly thereafter. J.M.'s mother lived nearby, paid J.M.'s rent and utilities, and visited often.

[3] On September 8, 2018, J.M. told Bellamy that their relationship was over. At his urging, she allowed him to stay at the apartment for another week while he searched for new accommodations. That evening, the two twenty-year-olds drank alcoholic beverages that Bellamy had purchased. Bellamy became very angry over text messages and a phone call that J.M. received from another man and called her a "stupid b*tch" and a liar. Tr. Vol. 2 at 22. He grabbed her dog by the scruff of its neck and threw it across the room. J.M. picked up her dog and attempted to leave the apartment, but Bellamy slammed the door on J.M.'s hand, injuring it and cracking her phone screen. J.M. slapped Bellamy's face

three times, and he punched her once in the face and twice in her abdomen. At one point, he put her in a chokehold between his bicep and forearm, and she could not breathe. When she screamed for help, he momentarily grabbed a butter knife and threatened to kill her. He took her phone outside and told her that he had discarded it so that she would have no way of contacting anyone.

[4] Shortly thereafter, J.M. again attempted to make a "run for it," and exited the apartment. *Id*. at 29. By this time, it was dark and rainy outside. As J.M. ran, Bellamy chased her down and tackled her to the ground. In the ensuing struggle, her fingernail was torn off. While she was still on the ground, Bellamy held her in a chokehold between his bicep and forearm until she briefly lost consciousness. When she regained consciousness, Bellamy forced her back inside the apartment and made her change his wet clothes for him and change her own clothes in front of him. She described his demeanor as going back and forth from extremely angry to apologetic to weepy. He forced her to hold him in her lap on the couch for what seemed like a long while; then, without explanation or comment, he got up and walked out of the apartment. Shortly thereafter, J.M. found her phone (which Bellamy had actually hidden inside the apartment) and exited the apartment through a previously barricaded back door.

[5] Once outside, J.M. phoned her mother, Daisy, who hurried over to J.M.'s apartment. The two then drove to Daisy's home. As they pulled in the driveway, they saw Bellamy approaching, riding very fast on a bicycle. The two women rushed in through the back door, locked it, and made 911 calls.

Meanwhile, Bellamy stood outside the back door, yelling and banging his head repeatedly against the double-paned glass portion of the door. The outer pane broke, and Bellamy's forehead bled on the glass and the porch. When Bellamy saw police lights approaching, he fled on foot. Town Marshal Ron Buchanan tended to the distraught women as they briefly recounted what had occurred. Marshal Buchanan observed J.M.'s injuries to her face, legs, arms, and neck, and officers took photographs of these injuries. Marshal Buchanan, who had previously worked thirty-six years as a paramedic, noted that the redness on J.M.'s neck was consistent with a person who had been choked between a bicep and a forearm.

[6] Marshal Buchanan accompanied J.M. and Daisy back to J.M.'s apartment. He searched the apartment and instructed them to lock the door when he left. Minutes later, Bellamy banged on the door, identified himself as an officer, and instructed the women to open the door. Daisy approached the door, but J.M. recognized the voice as Bellamy's and told her not to open it. They called 911, and Marshal Buchanan returned. By that time, Bellamy had fled, and his whereabouts were unknown, so the marshal advised the women to leave town. They stayed three nights in a nearby town with Daisy's boyfriend and returned once Bellamy had been apprehended.

[7] The State charged Bellamy with level 6 felony strangulation and class A misdemeanor domestic battery. Bellamy waived his right to a jury trial, and a bench trial ensued. The trial court convicted Bellamy of level 6 felony strangulation, and although the court specifically found that the evidence

supported a conviction for class A misdemeanor domestic battery, the substance of the charging information was insufficient to support the charge. As a result, the court convicted Bellamy of battery as a class B misdemeanor.

[8] At sentencing, the trial court identified as aggravators Bellamy's juvenile and adult criminal history and his repeated violations of his placements. The court also considered the fact that Bellamy was on probation for a burglary conviction and was out on bond for unrelated charges when he committed the current offenses. The court characterized the protracted nature of the current offenses as a "night of terror." *Id*. at 195. As mitigators, the court noted Bellamy's family support and desire to provide for his current girlfriend and her child. The court sentenced Bellamy to a two-year executed term for strangulation and a concurrent 180-day term for battery, plus a civil restitution order for $600. Bellamy now appeals. Additional facts will be provided as necessary.

## Discussion and Decision

## Section 1 – The evidence is sufficient to support Bellamy's conviction for level 6 felony strangulation.

[9] Bellamy challenges the sufficiency of the evidence to support his strangulation conviction. When reviewing a challenge to the sufficiency of evidence, we neither reweigh evidence nor judge witness credibility. *Moore v. State*, 27 N.E.3d 749, 754 (Ind. 2015). Rather, we consider only the evidence and reasonable inferences most favorable to the verdict and will affirm the

conviction unless no reasonable factfinder could find the elements of the crime proven beyond a reasonable doubt. *Id*. Reversal is appropriate only when reasonable persons would be unable to form inferences as to each material element of the offense. *McCray v. State*, 850 N.E.2d 998, 1000 (Ind. Ct. App. 2006), *trans. denied*. The evidence need not "overcome every reasonable hypothesis of innocence." *Dalton v. State*, 56 N.E.3d 644, 647 (Ind. Ct. App. 2016) (citation omitted), *trans. denied*.

[10] To convict Bellamy of level 6 felony strangulation, the State was required to demonstrate beyond a reasonable doubt that he (1) knowingly or intentionally, and (2) in a rude, angry, or insolent manner, (3) applied pressure to J.M.'s throat or neck in a manner that impeded J.M.'s normal breathing or blood circulation. Ind. Code § 35-42-2-9(c). Bellamy asks that we impinge on the province of the trial court as factfinder and reassess J.M.'s credibility pursuant to the "incredible dubiosity" rule. According to this rule,

> If a sole witness presents inherently improbable testimony and there is a complete lack of circumstantial evidence, a defendant's conviction may be reversed. This is appropriate only where the court has confronted inherently improbable testimony or coerced, equivocal, wholly uncorroborated testimony of incredible dubiosity. Application of this rule is rare and the standard to be applied is whether the testimony is so incredibly dubious or inherently improbable that no reasonable person could believe it.

*Fajardo v. State*, 859 N.E.2d 1201, 1208 (Ind. 2007) (citations omitted). For this rule to apply, there must be a sole testifying witness, testimony that is inherently

contradictory, equivocal, or coerced, and a complete absence of circumstantial evidence. *Moore*, 27 N.E.3d at 756.

[11] J.M. was not the sole testifying witness, and her testimony was neither contradictory nor equivocal. She unwaveringly recounted the events at the apartment, which included Bellamy's headlock hold around her neck both inside the apartment and later outside after he tackled her to the ground from behind. Tr. Vol. 2 at 69. This latter incident involved a stranglehold so tight that J.M. temporarily lost consciousness. Marshal Buchanan, who had thirty-six years' experience as a paramedic, testified that he observed redness on J.M.'s neck consistent with having been placed in a stranglehold between a person's bicep and forearm. He explained J.M.'s development of petechiae, which is redness caused when the small blood vessels in the eyes burst due to the compression of large blood vessels such as those in the neck. J.M.'s testimony that her eyes became more bloodshot in the days following the attack was supported by Marshal Buchanan, who explained that this type of injury becomes more noticeable in the days after a strangulation. The only contradiction was Bellamy's denial that he strangled her. Simply put, the nature and corroboration of J.M.'s testimony do not support the application of the incredible dubiosity rule to this appeal. The trial court, as trier of fact, found J.M. to be credible and Bellamy to lack credibility. We decline Bellamy's invitation to reassess credibility, and find the evidence sufficient to support Bellamy's strangulation conviction.

## Section 2 – Bellamy has failed to demonstrate that his sentence is inappropriate in light of the nature of the offense and his character.

[12] Bellamy asks that we reduce his sentence pursuant to Indiana Appellate Rule 7(B), which states that we "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, [this] Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." "Sentencing is principally a discretionary function in which the trial court's judgment should receive considerable deference." *Cardwell v. State*, 895 N.E.2d 1219, 1222 (Ind. 2008). When a defendant requests appellate review and revision of his sentence, we have the power to affirm or reduce the sentence. *Akard v. State*, 937 N.E.2d 811, 813 (Ind. 2010).

[13] In conducting our review, our principal role is to leaven the outliers, focusing on the length of the sentence and how it is to be served. *Bess v. State*, 58 N.E.3d 174, 175 (Ind. 2016); *Foutch v. State*, 53 N.E.3d 577, 580 (Ind. Ct. App. 2016). This allows for consideration of all aspects of the penal consequences imposed by the trial court in sentencing, i.e., whether it consists of executed time, probation, suspension, home detention, or placement in community corrections. *Davidson v. State*, 926 N.E.2d 1023, 1025 (Ind. 2010). We do "not look to see whether the defendant's sentence is appropriate or if another sentence might be *more* appropriate; rather, the test is whether the sentence is 'inappropriate.'" *Foutch*, 53 N.E.3d at 581 (quoting *Barker v. State*, 994 N.E.2d 306, 315 (Ind. Ct. App. 2013), *trans. denied* (2014)). The defendant bears the

burden of persuading this Court that his sentence meets the inappropriateness standard. *Bowman v. State*, 51 N.E.3d 1174, 1181 (Ind. 2016).

[14] In considering the nature of Bellamy's offenses, "the advisory sentence is the starting point the Legislature has selected as an appropriate sentence." *Green v. State*, 65 N.E.3d 620, 637-38 (Ind. Ct. App. 2016), *trans. denied* (2017). When determining the appropriateness of a sentence that deviates from an advisory sentence, we consider whether there is anything more or less egregious about the offense as committed by the defendant that "makes it different from the typical offense accounted for by the legislature when it set the advisory sentence." *Holloway v. State*, 950 N.E.2d 803, 807 (Ind. Ct. App. 2011).

[15] The trial court sentenced Bellamy to an aggregate two-year executed sentence, comprising a two-year executed term for his level 6 felony conviction and concurrent 180-day term for his class B misdemeanor conviction. A level 6 felony carries a sentencing range of six months to two and one-half years with a one-year advisory term. Ind. Code § 35-50-2-7. A class B misdemeanor carries a sentence of not more than 180 days and a fine of not more than $1000. Ind. Code § 35-50-3-3.

[16] In examining the nature of Bellamy's offenses, we cannot ignore the trial court's characterization of the events as a "night of terror," with three separate backdrops and multiple violent outbursts. Tr. Vol. 2 at 195. In the throes of his anger and jealousy, Bellamy first went after J.M.'s dog, throwing it across the room. When J.M. sought to leave, Bellamy refused to allow it and slammed

the door on her hand, injuring her and damaging her phone. When she slapped his face, he upped the ante, punching her with his fist, first in the face and then twice in the abdomen. He placed her in a chokehold, and she could not breathe. He threatened her with a butter knife, and when she again tried to leave the apartment, he followed her out into the rain and tackled her from behind. In her beleaguered yet desperate struggle, her fingernail tore completely off. She testified that she thought Bellamy was going to kill her. *Id.* at 32. Bellamy placed her in a prolonged stranglehold between his bicep and forearm, "squeezing tighter and tighter" until she passed out. *Id.* at 69. After she revived, he humiliated her by forcing her inside the apartment to undress and dress in front of him and to do the same for/to him. He then forced her to hold him in her lap for what seemed like a long time. Then, without a word, he simply got up and left. This precipitated J.M.'s exit and call to Daisy, who drove her to her house.

[17] But the night was not over. Bellamy followed the women to Daisy's house and banged his head on the glass door until the outer pane broke, with shards of glass causing blood to drip onto the door and porch. Daisy recounted that every time Bellamy banged his head, she could see the inside doorframe separating from the wall. *Id.* at 80. She described J.M. as traumatized and herself as "scared to death." *Id.* at 81. It was the approaching police lights that caused Bellamy to stop and flee the scene. But again the night was not over. Bellamy waited until the women returned to J.M.'s apartment and the marshal left; then, pretending to be a police officer, he ordered them to open the door.

The 911 calls underscore the terror of the night, as Bellamy followed the frightened women from place to place. In short, the "whole" of the night was greater than the sum of its parts. The night was rife with other uncharged conduct by Bellamy, and it was the deficient charging information, not the strength of the evidence, that limited Bellamy's battery conviction to a class B misdemeanor instead of the more serious original charge of domestic battery. The nature of Bellamy's offenses simply does not militate toward a shorter sentence, nor does Bellamy's character.

[18] We conduct our review of his character by engaging in a broad consideration of his qualities. *Aslinger v. State*, 2 N.E.3d 84, 95 (Ind. Ct. App. 2014), *clarified on other grounds on reh'g*, 11 N.E.3d 571. "When considering the character of the offender, one relevant fact is the defendant's criminal history." *Garcia v. State*, 47 N.E.3d 1249, 1251 (Ind. Ct. App. 2015), *trans. denied* (2016). Bellamy is relatively young, just twenty-one years old at the time of sentencing, yet his criminal history is already lengthy. His entanglements with the juvenile system began during his early teens and include adjudications for conduct amounting to auto theft and criminal mischief if committed by an adult. He ran away from a juvenile detention facility during one of his commitments. His adult history includes a conviction for level 5 felony burglary and a conviction for driving while suspended. After having served a portion of his burglary conviction in the DOC, he was released to home detention but was remanded to the DOC for multiple violations, including failure to report for drug screens and community service, having alcohol in his residence, and leaving the residence without

permission. He later was placed on probation, only to have it revoked when he committed new criminal offenses. Shortly before he committed the current offenses, he was charged with domestic battery of a different girlfriend (later dismissed) and driving while suspended. When he committed the current offenses, he was serving probation in one cause and was released on bond in another cause. Bellamy now claims that he is a changed person and asks for probation so that he can work to provide financial support for his current girlfriend and her child. However, his failure to abide by the law and by the rules of his placements does not bode well for future placement in sentencing programs outside the DOC.

[19] Bellamy also has a history of drug use. He admitted that he used marijuana from ages fourteen to eighteen and methamphetamine from ages sixteen to seventeen. Although he was only twenty years old, he purchased and consumed alcoholic beverages immediately before he committed the current offenses. His character simply does not merit a reduced sentence. Based on the foregoing, we conclude that Bellamy has failed to meet his burden of demonstrating that his sentence is inappropriate. Consequently, we affirm it.

[20] Affirmed.

Bailey, J., and Altice, J., concur.